# Exhibit 5

**Colleen Wilson, Sunset Consulting**
419 N Arnold Drive
Coolin, ID 83821
425-422-3958
E-mail: colleenwilson@comcast.net

I have been retained by Richard Jolley, of Keating, Bucklin, and McCormack, counsel for Thurston County, and John Justice, counsel for the City of Olympia, and the individual defendants, as an expert witness in the case of Shriver v Olympia Police Department 22-CV-05138-MJP to review the initial response to the domestic violence call on at 4318 5th Ave NW, Olympia WA, on January 26-27, 2020.

I am an experienced law enforcement executive, having led three different police departments during my 23 years as a police chief. I was the Chief of Police in Monroe, Sumner, and at the Port of Seattle, Washington. My 40 years of public safety service included coming up through the ranks to become the Chief of Police and then leading two more police agencies. This experience includes successfully developing challenging organizations into workplaces with very high standards and significantly reduced complaints against officers. All three agencies were accredited by the State of Washington's Law Enforcement Accreditation program during my tenure and the agency from which I retired in November 2016, was nationally accredited by the Commission on Law Enforcement Accreditation (CALEA). I was also employed as the Peace Officer Certification Manager for the State of Washington where I implemented the State's first Peace Officer Certification Statute and investigated law enforcement officers accused of serious misconduct.

I was the elected president of the Washington Association of Sheriffs and Police Chiefs (WASPC) and upon retirement was named a life member, a privilege reserved for under a hundred of the Police Chiefs and Sheriffs in the history of the organization. I was also the first recipient of the Devaney/Shannahan Leadership Award from that organization for my work on policy development and response to Officer-Involved Domestic Violence.

I was a member of the Washington State Criminal Justice Training Commission (CJTC-equivalent to POST in many states) which I also chaired.    I was appointed by three different governors and a Supreme Court Justice to various State-wide task forces and received public safety partnership awards from two different Chambers of Commerce and from the national office of the Transportation Security Administration.

I have conducted more than a dozen assessments of public safety agencies through the Washington Association of Sheriffs and Police Chief's Law Enforcement Management Assistance Program (LEMAP) and the US Department of Justice's Regional Community Policing Institutes. I authored reports reviewing tribal police agencies all over the northwest and provided technical assistance to three tribal police agencies as the team leader of a Federal pilot project in native communities. I also participated in an executive policing exchange with the North Umbria Police Department in Great Britain.

1

Over the course of my career, I developed and delivered police training in Reserve Police Academies, the State Basic Law Enforcement Academy; and Advanced and Specialized training, including the Washington State Criminal Justice Training Commission's (CJTC) mandatory core leadership curriculum. Early in my career, I taught sexual assault and child abuse investigations for CJTC as well. I co-authored the original domestic violence block of instruction at the Basic Law Enforcement Academy as well as its update several years later, working with an advocate from the Washington State Coalition Against Domestic Violence.

I have received training in domestic violence investigation processes from a wide variety of sources, including the Washington State Prosecutor's Association, the Washington State Criminal Justice Training Commission, and the Washington Association of Sheriffs and Police Chiefs, I have delivered domestic violence training for all those institutions. For the CJTC, I trained in the Advanced and Specialized Division, the (former) Satellite Training Division, and instructed in the original "Domestic Violence Teams Training" including an advocate, a prosecutor, and a police representative.

I also co-authored the original Washington Association of Sheriffs and Police Chiefs' Model Policy on Officer-Involved Domestic Violence mandated by the legislature. During that process, I reviewed related policies from nearly every police agency in the State of Washington.

I was a member of the State Domestic Violence Fatality Review Team, a multi-disciplinary team reviewing cases involving a death at the hands of an intimate partner. I was also a member of the State Child Fatality Review Team with similar responsibilities.

I also testified in Washington State Legislative hearings regarding the need for clarifying and strengthening Washington's laws. I co-authored and was awarded a grant to develop Washington's first multi-disciplinary Domestic Violence Community Response Team in a rural community.

My education includes Gonzaga University, the University of Southern California's Delinquency Control Institute, the University of Washington's Cascade Program for Executive Excellence, the Washington State Command College, the Washington State Criminal Justice Training Commission Executive Certification, the FBI National Academy, Session #172; and the FBI Executive Leadership Program as well as approximately 2,000 hours of in-service and advanced law enforcement training.

In the preparation of this report, I reviewed all or portions of the following materials that were provided to me by Richard Jolley:

1. Amended Complaint
2. Answer to Amended Complaint
3. DEFENSE VIDEO1
4. DEFENSE VIDEO2

2

5. DEFENSE VIDEO4
6. DEFENSE VIDEO5
7. Discovery - Plaintiff Githinji RESPONSES to Def Olympia's 1st Discovery
8. Discovery - Plaintiff Shriver RESPONSES to Def Olympia's 1st Discovery
9. Githinji, Dorcas Dep Transcript
10. Jason_Shriver_Booking_#49461_R
11. Jason_Shriver_Booking_#56238_R
12. OPD Police Report
13. OPD Police Report
14. Search Warrant
15. OPD Supplemental Report by Glenn
16. OPD Supplemental Report by Manning
17. Swat Report File

I also reviewed sections of the Revised Code of Washington (RCW) as well as Olympia Police Department Updated Policies Chapter 3, 310 Domestic Violence as posted on the city website, State of Washington, and the Washington law enforcement accreditation standards from the Washington Association of Sheriffs and Police Chiefs (WASPC).

In conducting my review, I apply:

- My law enforcement education and training;
- My training and experience as a chief of police for three different police agencies in the State of Washington.
- My experience working with and training with the groups in Washington State and beyond who advocate for victims of violence against women.
- My experience training for the Criminal Justice Training Commission and the State Crime Victims Association on interpersonal violence.
- My training in the dynamics of domestic violence and my experience responding and supervising those who respond to domestic violence, those who prosecute it, and those who assist victims of domestic violence with safety planning.
- My experience in reviewing cases related to, and training police officers in Washington State best practices related to domestic violence response.
- My experience with the Washington State Domestic Violence Fatality review team and the Washington State Legislature.
- My participation in or leading LEMAP and WRICOPS assessments of at least 12 law enforcement agencies from very small to the second largest city in the State.
- The laws and codes of the State of Washington.

I am being compensated at a rate of $300 per hour for my work in this matter.

I have previously consulted as an expert and prepared a report for the Pierce County Sheriff's Office in the case of Fralisa McFall on behalf of the Estate of Jessica Anne

3

Marie Ortega vs. Pierce County, Washington, Case No. 17-2-11836-8 in Washington State Superior Court; for Snohomish County in the case of Robert John Preston v. Ryan Boyer et al. C16-1106-JCC-MAT and for the City of Bellevue in Williams vs. Bellevue & Stephen Mylett No. 2:16-cv-01034-RAJ, United States District Court, Western District of Washington. I was deposed in the case of Edwards v. Bellevue & Stephen Mylett and Robert John Preston v. Ryan Boyer et al.

Based on my review of the documents furnished to me I submit the following about the Olympia Police Department January 20, 2020, response to the call at 4318  5th  Ave. NW,  Olympia, Washington.

As I reviewed the materials and watched the videos of the officers' response to the call, *RCW 10.99.010 Purpose and Intent* repeatedly came to mind:  *"…the necessity for early intervention by law enforcement agencies. It is the intent of the legislature that the official response to cases of domestic violence shall* **stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated.**

Further, I recalled from training in this area for so many years, the RCW training mandate *RCW 10.99.030 Law enforcement officers—Training, powers, duties— Domestic violence reports*, which states, " *All training relating to the handling of domestic violence complaints by law enforcement officers shall* **stress enforcement of criminal laws in domestic situations, availability of community resources, and protection of the victim."**

The Olympia officers seemed concerned with the safety of the community from the first minutes of their response, repeating "We just want to make sure no one gets hurt". The officers were cautious for their own protection as they had been alerted to an officer safety flag indicating that the person in this residence has threatened to hunt down an officer and kill him.  But there is nothing in their demeanor to indicate that they are reacting to Jake unfairly or in a negative manner.  On the contrary, they all appear calm and genuinely concerned for the safety of all concerned, including officers.  They repeatedly ask Jake to calm down and do not respond to his taunts and threats.  He is threatening to release the (viciously barking) dog on them, saying it will "bite your face off", threatening to sue them, and generally complaining about a previous theft response as well as calling them names, yet none of them engage.  Rather, they seem very focused on protecting the victim and keeping the parties apart.  In the basic academy, one of the first things officers are trained to do is to separate the parties right away to avoid further escalation.

One of the officers (whose vantage point is apparently different than the camera) has stated he saw Jake physically obstruct Wanjiku's access to the door twice and in the video, one can hear Jake telling her not to go outside. She comes outside willingly once she has access to the door.  She told Officer Glenn, the negotiator, that she even hugged Jake before she walked out the door, but that doesn't appear accurate from the video.  Wanjiku tells the officers over and over that there is nothing wrong but does not

4

ask to be let back into the house. Wanjiku later tells the negotiator that Jake opened the door to let her out, but the video clearly shows that she opens the door herself as Jake has stepped away and as he returns, the officers tell him, "Let her come out". It is doubtful they would respond that way unless they perceived that he was attempting to keep her from going out. In her deposition she describes asking Jake, "Just let me go out and tell them I'm okay." Her wording implies to me that in her recollection, Jake was keeping her from going out the door as well. Jake tells Wanjiku, "They are not your friends". Wanjiku tries to calm Jake down, even cooing to him from outside the door but is "gentle" or tentative in any attempt to return inside the apartment. In fact, she herself closes the door more than once. She tries to calm Jake from outside the screen door, cooing to him as though he were a child at one point. She tries to calm everyone down.

The officers have seen Jake try to physically control Wanjiku. They know that there is a prior history of domestic violence at the address, which is one of the important things the officers are trained to consider in domestic violence situations. The guns in the house are "still in evidence boxes" in the living room, according to Wanjiku (to the negotiator) which means they were likely confiscated in the last domestic violence incident. They know that Jake has had a lot to drink. All of this adds up for the officers. Based on my experience, I would say that the threats to kill officers they have been made aware of and the later information about suicide threats the officers are hearing, coupled with guns on site would make them consider this situation to have a high potential for lethality. I recall data indicating that the combination of suicide threats and guns alone creates a very high percentage of lethality, meaning there is a likelihood of death to the victim, the suspect, or a police officer in such situations. The officers had good reason to approach this situation carefully and methodically and with great caution.

In her deposition, Ms. Githinji remembers many of the details of the 2020 incident differently than we see in the video, such as minimizing Jake's reaction to her going outside saying that he was not upset at her and that he opened the door for her. Wanjiku also mentioned a time in 2021 when Jake "kind of knocked the bed and I fell". She said, "he hit the bed and the bed flipped and I hit the wall", speaking of it almost as though it were an accident, yet it was enough for her to call the police. By the time they arrived, she did not want to press charges. In my experience, minimizing violent behaviors and even justifying the actions of the abuser is common for victims. They are like the rest of us and love the good parts of their relationships. They want the abusive behaviors to stop but they know the things that calm their own situation, which sometimes includes "siding" with the offender. It is not uncommon for police officers to be attacked by victims during DV arrests. They call the police for safety, but they know they will not stay safe if they continue with accountability like prosecution and they are fearful when police actually intervene. They learn what keeps them safe even though it may not make sense to the casual observer. Wanjiku tries to step back into the house at one point, but that does not necessarily mean she wasn't fearful of Jake. Rather it may mean she thinks she's safer with him than having him view her as working with the police whom he continues to be agitated with. In her deposition, Wanjiku also states that the officers pushed and shoved her while she was asking to go inside but we do not

5

see that in the video. They quickly ushered her away at one point for her safety, but she states that were dragging her. In the video, they have arms around her, but she is clearly walking. Joining in the effort to make the police the "bad guys" may also be a way to help keep herself safe as she may be dependent on Jake. Advocates always taught us as law enforcement officers that we should respect the victim's decisions about their own safety as they lived with changing moods and potential violence every day. They learn what works best to keep things calm and invest a lot of energy to stay safe.

In summary, it is my opinion that the Olympia Police response was consistent with their operating procedures and with Washington State Law as well as the training provided to law enforcement officers in Washington. I viewed a calm, respectful response on the part of the Olympia Police Department even though they were being taunted and threatened. Their concern for the victim was appropriate and the victim's behaviors are consistent with those I have seen in other victims and have trained officers to look for. Their response is one I would condone in any of my past police agencies.

It appeared that the officers recalled their training that stressed the enforcement of criminal laws….and protection of the victim in the handling of domestic violence complaints." I believe the intent of RCW 10.99.030 was met in that the police clearly stressed enforcement of the laws to protect the victim and calmly communicated the attitude that violent behavior would not be excused or tolerated.

I am prepared to testify to these opinions in depositions or at trial if called upon to do so. If I am provided with further documentation for my review, I may have additional opinions.

Respectfully submitted,

Colleen Wilson

6