# Exhibit 8

**Report of Chris M. Nielsen**
**In the matter of**
**Shriver, et al., v. The Olympia Police Department, et al.**
**U.S. District Court, Western District of Washington - Tacoma**
**Case no. 3:22-cv-05138-MJP**

I have reviewed the current case at the request of the attorneys for the Olympia Police Department. I have further reviewed actions taken by members of the Olympia Police Department during the events occurring on January 26, 2020.

I am currently a commissioned police sergeant in the State of Washington. I have been a law enforcement officer for approximately 12 years. During my career as commissioned police officer I have held assignments in administration, patrol operations, special operations, investigations and with the Valley Regional SWAT Team (VSWAT). I served on VSWAT for approximately six years before transitioning to a supervisory position in patrol operations and, subsequently, administrative services, where I currently serve. As a police officer I have approximately twenty-seven thousand hours of training and operational experience in patrol-level operations, tactics, supervisory and leadership experience.

My educational background is as follows: I have an Associate of Arts degree from Bellevue College, a Bachelor of Arts in psychology from the University of Washington (*cum laude, Phi Beta Kappa*), a Master of Arts degree in political science from the Maxwell School of Citizenship and Public Affairs at Syracuse University and a *Juris Doctor* degree from the Syracuse University College of Law (*cum laude).*

**General Police Experience:** In August 2022 I was selected to serve as the administrative training sergeant at the Renton Police Department. As such, I am the primary supervisor for the entire training cadre serving a department of approximately 135 sworn police officers. As the administrative training sergeant, I monitor policy developments, contemporary training practices, and emerging trends in law enforcement training. I review all training procedures for compliance with policies, procedures, and best practices. In this role, I am a designated subject matter expert in use of force training/defensive tactics, firearms training, crisis intervention, de-escalation, less-lethal training (Taser, baton, chemical irritants, less lethal projectiles/launchers, etc.), patrol tactics (field contacts, investigative detentions, custodial arrests, handcuffing techniques, vehicle extractions, building/structure clearing, etc.), emergency vehicle operation (EVOC), first aid, and criminal procedure, report writing, etc.

I am responsible for the recruitment, hiring, and training of all administrative personnel, new-hire and lateral police officers. In this role, I coordinate recruiting efforts, background investigations, polygraph examinations, psychological testing, health screening, basic academy training and field training. I oversee the assignment of all patrol equipment, including uniforms, ballistic protection, firearms/firearm accessories/ammunition, body worn cameras, police radios, "stop sticks," less-lethal equipment (Taser, baton, chemical irritants, 40 mm launchers), etc.

Prior to being selected to the administrative training sergeant position, I was selected for promotion to patrol sergeant and assumed formal supervision of a patrol group commencing in March 2021. In this capacity I supervised an early nightshift patrol unit. My responsibilities included a variety of administrative

duties, including evaluating the performance of police officers, drafting and documenting performance evaluations, reviewing training application requests, managing staffing levels and time management software, managing training requirements, responding to citizen queries and complaints, managing patrol/community outreach efforts, managing equipment needs, implementing administrative directives, and ensuring compliance with statutory, policy and generally accepted procedural and tactical principles in patrol operations.

Prior to being promoted to sergeant, I served approximately four years as the Officer in Charge (OIC) of a special operations proactive enforcement unit. In this capacity I have broad experience supervising police officers tasked with providing operational support to various divisions within an accredited police agency consisting of approximately 135 commissioned law enforcement officers. My responsibilities included reviewing and approving tactical operational plans, police reports, use of force reports/incidents, vehicle pursuits and general police activities for compliance with statutory, policy, and generally accepted procedural and tactical principles in a special operations domain.

Since 2013 I have been a member of the Renton Police Department's Lethal Force Review Board. In this capacity I review all lethal force incidents involving Renton Police Officers for conformity with constitutional requirements, statutory/case law, department policies and generally accepted procedural and tactical principles. I have attended and successfully completed numerous courses on the study of human performance, perception, and cognition, including Introduction to Human Dynamics and Conflict Resolution (2 days consisting of 16 instructional hours), Force Science Analyst Certification (5 days consisting of 40 instructional hours), and Force Science Advanced Specialist Certification (18 weeks consisting of approximately 300 instructional and clinical hours). This field focuses on human performance in the realm of vision, attention, learning/performance, memory, decision-making, speed/dynamics, and human error as applied to police training, tactics, procedures, and critical incidents.

I have substantial training, experience and familiarity with scientific literature involving human performance under stress, including the many ways in which stress impacts the physical performance, physiology, and cognitive processes in human subjects. This training and knowledge augment my professional experience in police-related matters, including critical incidents where events are volatile, uncertain, ambiguous, and complex. Consequently, I have a sound theoretical and practical understanding of the complexities of human performance in police operations.

I have training and operational experience in crisis intervention, de-escalation techniques and dealing with subjects in mental crisis and/or under the influence of mind-altering substances. I have personally dealt with numerous individuals in the throes of mental crises and/or under the influence of mind-altering substances. Through these experiences I have utilized trained and novel techniques in resolving many such encounters without the use of force; however, through my experience I know the actions of a given individual oftentimes dictate police response and the eventual resolution of the encounter. Accordingly, I have experience using force subsequent to unsuccessful attempts to de-escalate encounters.

I have training in principles related to bias-based policing, bias, implicit bias, equity, and inclusion as it relates to contemporary principles in modern policing.

My professional experience includes the response, investigation and arrest of offenders for crimes such as misdemeanor/felony domestic violence crimes, vehicular assault, felony/misdemeanor theft, ID theft, trafficking/possession of stolen property, narcotics possession/trafficking, reckless/negligent driving, DUI,

obstructing a law enforcement officer, resisting arrest, indecent exposure, communication with a minor for immoral purposes, commercial sexual abuse of a minor, rape, rape of a child, child molestation, murder, manslaughter, attempted murder, theft of a motor vehicle, possession of a stolen vehicle, felony/misdemeanor malicious mischief, bail jumping, disorderly conduct, residential burglary, robbery, unlawful transit conduct, breach of peace, unlawful use of a building for drug purposes, unlawful possession of a firearm, drive-by shooting, driving while license suspended, money laundering, forgery, criminal trespassing, malicious harassment, harassment, failure to disperse, criminal mistreatment, animal cruelty, attempt to elude a pursuing police vehicle, illegal discharge of a firearm, and myriad offenses included in the Revised Code of Washington.

I have training and operational experience in the operation and use of less-lethal tools such as the X2 and X26 model taser ECW, collapsible/non-collapsible batons, OC spray, CS gas and 37- and 40-mm munitions and less-than-lethal projectiles. I have basic training in physical combat disciplines such as mui thai, Brazilian Jiu Jitsu, traditional boxing, and freestyle/collegiate wresting at the collegiate level. I have training and operational experience in traditional police defensive tactics techniques involving joint manipulations, "pain compliance techniques", weapons defense/retention and edged weapons defense. I have been involved in numerous use of force incidents including taser applications, chemical agents, vehicles, firearms, joint manipulations/pain compliance, and a variety of knee, palm, shin and fist strikes and kicks. I have been slapped, kicked, tackled, spat upon, rammed with a vehicle, and targeted by direct gunfire. As a result of these incidents I have been admitted to the hospital and sought emergency medical treatment approximately six times during my career. Additionally, I have been tased numerous times in both training and during live operations. I have experienced numerous chemical agent exposures, such as OC and CS gas in both training and operational environments.

I have training and experience in "quarrying" tactics, techniques and procedures in working with police tracking canines. In this capacity I have worked with numerous police canines in training scenarios, including: outdoor canine tracks, indoor canine tracks, direct canine applications, vehicle extractions, canine handler assaults, and SWAT applications, among others. I have been contacted numerous times by police canines during these activities.

I have training and operational experience in emergency vehicle operations including vehicle pursuits, PIT techniques and vehicle displacement techniques using marked, unmarked and under cover vehicles. I am familiar with various policies, procedures, laws and regulations related to this topic. Likewise, I am familiar with generally accepted tactics, techniques and principles involving emergency vehicle operation and pursuits. I have been involved in approximately twenty vehicle pursuits including approximately nine involving direct vehicle contact in various forms. Most of my career has involved the use and operation of an unmarked police vehicle.

I have training and operational experience in patrol and SWAT-level high-risk vehicle stops and vehicle extraction techniques for compliant and non-compliant/combative subjects, including high-risk mobile arrest and vehicle window breaching tactics.

I was formerly assigned to a mounted bicycle patrol unit for approximately 6 years. I am an International Police Mountain Bike Association (IPMBA) certified patrol officer. I have training and operational experience in mounted bicycle patrol tactics, including crowd control, investigative, arrest and proactive patrol tactics, techniques and procedures.

I am currently a firearms instructor for the Renton Police Department. In this capacity I receive advanced training and instruction in adult learning models and firearms tactics. I develop lesson plans, review case studies in lethal force incidents, and monitor emerging trends/tactics and generally accepted police practices related to firearms training and use. I instruct police officers with various professional experience in basic/advanced marksmanship, basic/advanced weapons manipulation, basic/advanced tactical movement, firearms maintenance/repair, defensive tactics involving lethal force options and a variety of other subject matter related to firearms.

During my career I have authored, reviewed or participated in the drafting and service of approximately three hundred search warrants, including residential, automobile, financial, business records, computers, mobile devices, body cavities and myriad other applications.

**Specialized/SWAT/Tactical Experience:** Between 2015 and 2021 I was assigned to the Valley Regional SWAT team (VSWAT). VSWAT is a regional team consisting of personnel from the cities of Auburn, Des Moines, Federal Way, Kent, Renton, Tukwila and the Port of Seattle. VSWAT is one of the largest and most active tactical teams in the Pacific Northwest. In my SWAT experience I have been involved in approximately five hundred live operations and I have approximately four thousand seven-hundred hours of training and operational experience.

During this period I was simultaneously assigned to the Special Operations Division at the Renton Police Department. In this capacity, I was assigned to a proactive street crimes unit with other SWAT and non-SWAT trained officers. My duties included, providing tactical, operational, and investigative support for a plainclothes/undercover investigative unit. I have training and operational experience in both uniformed and plain clothes operations, including mobile/static surveillance, high-risk arrest operations, residential warrant service, arrest warrant service, narcotics investigations, property crimes investigations, violent crimes, child crimes, and sex crimes, among others.

I have training and operational experience in short and long-term investigations, including complex operations targeting human trafficking and child sex crimes. During these investigations, I have provided surveillance, tactical, and investigative support for undercover operations targeting the child sex trade. These operations generally involve monitoring various social media platforms and interacting with subjects interested in sexual activities related to children and underage persons. I have experience monitoring electronic communications between adult suspects (usually males) and undercover detectives posing as children or offering sex with children. I have experience with the general terminology and lexicon related to underground/deviant sexual culture, including the child sex trade. I have surveilled, arrested, and conversed with individuals under investigation, under arrest, prosecuted for, and convicted of child sex crimes.

Between 2016 and 2021 I served as an instructor for the Washington State Tactical Officers Association (WSTOA). WSTOA is one of the primary training entities for basic and advanced-level SWAT instruction in Washington State and the Pacific Northwest. Prior to being operational, all SWAT officers are required to attend a 60-hour basic SWAT operator course. WSTOA contracts with the Washington State Criminal Justice Training Commission to provide basic SWAT instruction for tactical officers in the Pacific Northwest. In this role I provide instruction to commissioned police officers in mission planning, basic building clearing techniques, mechanical breaching, officer rescue, high-risk vehicle arrest tactics, chemical munitions, less-lethal options, immediate action drills, tactical fitness and a variety of other topics related to special operations/SWAT.

I am a Washington State certified explosives handler. I have training and operational experience in high-energy/explosive breaching. In this capacity I plan the deployment and use of explosive compounds designed to gain access to a variety of structures and otherwise provide vantage points for tactical operations.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in law enforcement active shooter response and chemical/less lethal munitions. Additionally, I am an NTOA certified instructor in active shooter response for non-government organizations (NGOs) and a counter-terrorism response tactics instructor for south King County metro agencies. In these roles, I instruct police officers from various agencies across the Pacific Northwest in basic SWAT tactics, active shooter response tactics and protocols, counter-terrorism response tactics and protocols, mission planning and the deployment and use of chemical and less lethal munitions. Further, I instruct various stakeholders in public and private organizations in current practices and techniques in responding to workplace violence/mass-casualty/active shooter events.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in the tactical deployment, physiological/psychological effects, techniques and procedures for less-lethal munitions, chemical munitions and noise flash diversionary devices (NFDDs, commonly known as "flash bangs"). I have instructional, operational and training experience, including numerous exposures, to less-lethal tools, chemical munitions and NFDDs.

I have live, operational and instructional experience in a broad range of SWAT tactics including mission planning, basic and advanced building clearing techniques/CQC, hostage rescue, mass casualty/active shooter response, counter-terrorism response, barricaded subject tactics, high-risk search warrant service, high-risk mobile/static vehicle arrest tactics, mass-transit hostage rescue/barricaded subject tactics, dignitary protection, close-cover undercover/informant operations, downed officer/officer rescue, combat first aid, high-risk fugitive recovery/apprehension, mobile/static surveillance techniques, high-energy, mechanical and ballistic breaching, urban and woodland operational techniques, less-lethal and chemical munitions, basic/advanced rifle/pistol tactics, basic/advanced NVG rifle/pistol tactics/techniques and tactical fitness/preparedness.

I have been personally involved in numerous high-risk tactical operations including officer-involved critical incidents/shootings.

**Legal Experience:** I am an attorney currently licensed to practice law in the State of Washington. I have held this credential since October 2005. Prior to becoming a police officer, I was employed by the King County Prosecuting Attorney's Office (KCPAO) as a Deputy Prosecuting Attorney (DPA) in 2003 and again from 2005 – 2011. The KCPAO is the primary felony-level prosecuting entity in King County serving a population of approximately two-million residents. I was assigned as a trial attorney to the juvenile and adult divisions, including assignments to the violent crimes, narcotics, domestic violence, district court, car theft and special operations divisions. In this role I reviewed cases from every municipal police agency in King County in addition to various county agencies within and outside King County, as well as the Washington State Patrol, Washington State Department of Fish and Wildlife and a variety of federal/state task forces. I examined referrals from these agencies for legal sufficiency prior to filing misdemeanor and felony cases in district and superior court.

I was lead counsel on approximately sixty misdemeanor and felony jury trials ranging from misdemeanor theft to attempted murder. I reviewed cases for filing, conducted plea negotiations, reviewed search warrants for legal sufficiency, drafted and argued trial and appellate motions and participated in every phase of criminal prosecution from the investigative stage through final appeal and disposition.

During my assignment to the car theft unit and, later, special operations, I was an on-call attorney tasked with providing legal counsel, reviewing, and approving applications for search warrants presented by commissioned police officers and detectives. It is the policy of the KCPAO that all search warrants associated with cases filed within the county shall be reviewed by a DPA prior to being presented to a qualified magistrate. In this capacity I reviewed approximately one-hundred fifty search warrants for residential dwellings, electronic records and media, cell phones, business records, financial records, narcotics, commercial buildings, personal belongings (backpacks, purses, etc.), automobiles, global positioning surveillance and body cavities, etc.  The standard of proof for such documents is "probable cause." Accordingly, the KCPAO and the investigating agencies relied on my judgment and guidance to confirm the existence or absence of probable cause in affidavits for search warrants.

From 2009 – 2011 I was assigned to the Eastside Narcotics Taskforce (ENTF) as special counsel tasked with providing legal counsel, guidance, and oversight on mid/high-level narcotics investigations. ENTF was a regional narcotics taskforce consisting of personnel from the cities of Bellevue, Kirkland, Redmond, Mercer Island, the Washington State Patrol and King County. While at ENTF I assisted in the planning, drafting and oversight of numerous narcotics search warrants, applications for body wires and electronic surveillance. I examined these documents for legal sufficiency/probable cause prior to presenting them to a qualified magistrate for review and approval. I facilitated the seizure and forfeiture of real and personal property used, intended to be used or the proceeds of narcotics related activity and other felony crimes. I managed and litigated these cases from the investigation stage through final disposition.

From 2009 to present I have served as Hearing Examiner for various government agencies in Washington State, including the Cities of Bothell and Kent, King County, the Valley Narcotics Enforcement Team (VNET) and the Port of Seattle. A hearing examiner is a quasi-judicial officer tasked with overseeing the legal process associated with, in my case, the seizure and forfeiture of property associated with narcotics trafficking and the commission of felony-level crimes. In this role I am the primary administrative/judicial officer presiding over asset forfeiture proceedings pursuant to RCWs 69.50.505 and 10.105.010. I review pleadings, legal motions and preside over administrative hearings pursuant to Title 34 RCW and Chapter 10-08 of the Washington Administrative Code. The standards of proof in these proceedings are "preponderance of the evidence" and "probable cause." Accordingly, one of my fundamental duties is to review the sufficiency of police investigations and procedures to determine the existence or absence of probable cause.

From 2006 to 2013 I served as an adjunct instructor at the basic police academy at the Washington State Criminal Justice Training Commission. I provided guidance on curriculum, lectured, and administered practical exercises related to courtroom testimony and led discussions and interactive instruction on such topics as direct examination, cross examination, courtroom procedure/decorum, roles/responsibilities of courtroom personnel, strategies for effective testimony, identification and avoidance of common courtroom mistakes, effective report writing, etc.

I have developed and presented continuing legal education (CLE) trainings on the topics of use of force, force encounters, human performance/physiological responses to stress and tactical decision-making

under stress on multiple occasions to the King County Prosecutor's Office, the Washington State Association of Prosecuting Attorneys and a variety of government and non-government entities. Additionally, I have lectured and presented on various law enforcement topics and regional and national-level professional conferences.

**Specialty Training Courses**: Combat first-aid, Force Science Institute—the study of human performance during high-stress events; WSTOA SWAT Basic Academy, SWAT Team Leader course, NTOA Active Shooter Instructor Course, DARC Counter-terrorism regional response protocols, Glock armor course; Lethal force legal update (ongoing); CIT Intervention—dealing with subjects in mental crisis; Equity, Inclusion and Implicit Bias; Domestic Violence Investigations and Prosecutions (King County 4th and 5th annual DV Symposiums); Mobile/static Surveillance technique; DEA Narcotics interdiction; DOJ National Trial Advocacy Center advanced criminal litigation; NTOA "Train the Trainer" mass casualty/active shooter/workplace violence response; DOJ National Advocacy Center criminal trial attorney curriculum; Seattle PD Undercover School narcotics manufacturing bloc; FBI HRT Advanced Mechanical Breaching; Explosive breaching; Advanced trial techniques for prosecution of domestic violence; Advanced trial techniques for DNA evidence; Electronic surveillance; Presenting forensic evidence; Trial techniques for prosecuting narcotics manufacturing (methamphetamine, "crack" cocaine, LSD, marijuana, ecstasy, etc.); NTOA Less Lethal/Chemical Munitions Instructor Certification; CrossFit Levels 1 and 2 instructor; USPA "A" and "B" licensed skydiver.

All opinions included in the current report are based on my education, training, personal and professional experience and my review of the below listed materials. The opinions included herein are offered on a "more probable than not" basis and are subject to revision, reconsideration and further development pending the disclosure of new materials, facts, witnesses or other information not previously considered at the time of this writing. Discovery is ongoing and materials may be considered after production of this report.

Based on my education, training, personal and professional experience I have an objective basis to evaluate and opine on the actions of members of the Olympia Police Department during the course of this incident. A copy of my current *Curriculum Vitae* is available upon request. I authored this report after reviewing the following documents and materials:

## Discovery

- File "Binder 012620 OPD 20-0535" – Incident report/investigation for Olympia Police Department case 2020-0535, including:
    - Report of Olympia Police Officer Tiffany Coates (7 pages)
    - Report of Olympia Police Officer Nicholas Smith (2 pages)
    - Report of Olympia Police Officer Nicole Glenn (2 pages)
    - Report of Olympia Police Officer Kimberly Manning (1 page)
    - Report of Olympia Police Officer Josiah Lutz (1 page)
    - Photos of four handguns (1 page)
    - Thurston County Superior Court receipt for surrendered firearms dated 2/5/2020 (2 pages)
    - Thurston County Superior Court Order to Surrender Weapons dated 1/27/20 (2 pages)

- o Olympia Police Department Domestic Violence Supplemental Report for case 2020-00535 by Olympia Police Officer T Coates (4 pages)
- o Search warrant documents for Shriver residence (7 pages)
- o Arrest report for Jason Shriver dated 1/27/2020 (2 pages)
- o Thurston County Prosecuting Attorney's Office charging letter dated 1/29/2020 and Information charging Jason Shriver (2 pages)
- o Thurston County Prosecuting Attorney's Office disposition letter dated June 1 2021 and order of dismissal dated 5/27/2021 (2 pages)
- File "Photos " – Photos of damage to residence and Mr. Shriver's shoulder (75 photos)
- File "911 CALL " – Recording of 911 call (1:05)
- File "BRADY MEMO" – memorandum from Thurston County Deputy Prosecuting Attorney Travis Khuns and associated email correspondence (2 pages)
- File "CAD LOG" – CAD log for incident (7 pages)
- File "CALLS_FOR_SERVICE_200260752" – call for service report for call 200260752/case 2020-00535 (2 pages)
- File "DEFENSE VIDEO1" – surveillance video of front porch area of scene (2:00)
- File "DEFENSE VIDEO2" – continuation of surveillance video of front porch area (2:00)
- File "DEFENSE VIDEO4" – continuation of surveillance video of front porch area (2:00)
- File "DEFENSE VIDEO5" – continuation of surveillance video of front porch area (2:00)
- File "Jason_Shriver_Booking_#49461_R (1)" – Olympia Police Department booking report for arrest of Jason Shriver, Assault 4, on 5/12/17 (6 pages)
- File "Jason_Shriver_Booking_#49461_R" – Olympia Police Department booking report for arrest of Jason Shriver, Assault 4, on 5/12/17 (6 pages) (duplicate)
- File "Jason_Shriver_Booking_#56238_R (1)" – Olympia Police Department booking report for arrest of Jason Shriver, DV assault; DV property damage, on 9/5/19 (9 pages)
- File "Jason_Shriver_Booking_#56238_R" – Olympia Police Department booking report for arrest of Jason Shriver, DV assault; DV property damage, on 9/5/19 (9 pages) (duplicate)
- File "MEMO" – duplicate of File "BRADY MEMO" (2 pages)
- File "OPD_2020-00535-1" – duplicate of File "Binder 012620 OPD 20-0535" (35 pages)
- File "PHOTOS" – photos of four handguns (4 photos)
- File "POLICE REPORT" – reports of Olympia Police Officers Tiffany Coates and Nicholas Smith; DV reports (13 pages) (duplicates)
- File "SEARCH WARRANT" – search warrant for Mr. Shriver's residence (2 pages) (duplicate)
- File "shriver, jason - olympia orhtopaedic associates – centralized" – medical documents for Mr. Shriver ; shoulder surgery (45 pages)
- File "shriver, jason - proliance orthopaedics and sports medicine – Redmond" – medical documents for Mr. Shriver; back surgery (39 pages)
- File "SUPPLEMENTAL GLENN 012720" – report of Olympia Police Officer Nicole Glenn (negotiator) (2 pages) (duplicate)
- File "SUPPLEMENTAL MANNING 020520" – report of Olympia Police Officer Kimberly Manning (1 page) (duplicate)

- File "ATTORNEY-CLIENT PRIVILEGE_Jason Shriver 20-1-00165-34 Confirmation_offer" – email correspondence between Thurston County Deputy Prosecuting Attorney Alexis Egolf and defense counsel Tom Keehan
- File "Full page photo" – protection order and associated documents; Khamla Martin, petitioner; Jason Shriver, respondent; dated 9/21/2018 (13 pages)
- File "Pretrial Report" – pretrial screening report for Jason Shriver by Thurston County pretrial services (2 pages)
- File "Probable Cause Affidavit" – probable cause affidavit for current case (3 pages)
- TC Case 2020 – motion to terminate no-contact order in current case (1 page)
- Four photos of individual handguns (4 photos)
- File "CALLS_FOR_SERVICE_171320491" – record of call for service involving Mr. Shriver dated 5/12/2017 (1 page)
- File "CALLS_FOR_SERVICE_173100186" – record of call for service involving Mr. Shriver dated 11/06/2017; Mr. Shriver apparently threatened to kill police officer(s) (1 page)
- File "CALLS_FOR_SERVICE_182490946" – record of call for service involving Mr. Shriver dated 9/06/2018; Mr. Shriver called to report female partner assaulted him (1 page)
- File, "CALLS_FOR_SERVICE_191900016" – record of call for service involving Mr. Shriver dated 7/09/2019; report of motorcycle stolen (1 page)
- File "CALLS_FOR_SERVICE_192210732 – record of call for service involving Mr. Shriver dated 8/9/19; Mr. Shriver intoxicated, armed himself and confronted individuals at his home (2 pages)
- File "CALLS_FOR_SERVICE_192410621" – record of call for service involving Mr. Shriver dated 8/29/2019; Mr. Shriver called to report stolen vehicle (1 page)
- File "CALLS_FOR_SERVICE_192480005" – record of call for service involving Mr. Shriver dated 9/05/2019; neighbor called to report sounds of "things smashing and possibly someone being hit"; gun ran in call (1 page)
- File "CALLS_FOR_SERVICE_192660825" – record of call for service involving Mr. Shriver dated 9/23/2019; Mr. Shriver called to report vehicle prowl (1 page)
- File "CALLS_FOR_SERVICE_200260752" – record of call for service involving Mr. Shriver dated 1/26/2020; current event (2 pages)
- File "FIELD_CONTACT05252022_13_37_17" – report of field contact associated with 11/06/2017 call for service (1 page)
- File "OPD 2017-02699" – Olympia Police Department report for case 2017-02699 for 5/12/2017 call for service (20 pages)
- File "OPD 2018-05436" – Olympia Police Department report for case 2018-05436 for 9/06/2018 call for service (18 pages)
- File "OPD 2019-04218" – Olympia Police Department report for case 2019-04218 for 7/09/2019 call for service (13 pages)
- File "OPD 2019-05011" – Olympia Police Department report for case 2019-05011 for 8/09/2019 call for service (8 pages)
- File "OPD 2019-05469" – Olympia Police Department report for case 2019-05469 for 8/29/2019 call for service (8 pages)

- File "OPD 2019-05586" – Olympia Police Department report for case 2019-05586 for 9/05/2019 call for service (34 pages)
- File "OPD 2019-05998" – Olympia Police Department report for case 2019-05998 for 9/23/2019 call for service (5 pages)
- File "OPD 2020-00535" – Olympia Police Department report for case 2020-00535 for 1/26/2020 call for service – current case (35 pages)
- File "Transfer ⯌ RFP 3"
- File "Shriver Officer Safety Info" – NCIC return for officer safety information (7 pages)
- File "WSP ACCESS OPERATIONS" – WSP policy on violent persons entries for WACIC/NCIC (2 pages)
- File "Transfer ⯌ RFP 4"
- File "OPD 2017-02699" - Olympia Police Department report for case 2017-02699 for 5/12/2017 call for service (20 pages) (duplicate)
- File "Transfer ⯌ RFP 5"
- File "CALLS_FOR_SERVICE_172720817" – record of call for service involving Mr. Shriver dated 09/29/2017; Mr. Shriver reporting loud rap music coming from vehicle (1 page)
- File "CALLS_FOR_SERVICE_173130290" – record of call for service involving Mr. Shriver dated 11/09/2017; Mr. Shriver intoxicated; called to request police remove girlfriend from home; officer safety warning known (1 page)
- File "CALLS_FOR_SERVICE_181740801" – record of call for service involving Mr. Shriver's residence dated 6/23/2018; neighbor called to report loud motorcycles revving (1 page)
- File "CALLS_FOR_SERVICE_181740814 – record of call for service involving Mr. Shriver's residence dated 6/23/2018; neighbor called back to report people associated with Mr. Shriver's house intimidating him for calling police (1 page)
- File "CALLS_FOR_SERVICE_182340263" – record of call for service involving Mr. Shriver dated 8/22/2018; Mr. Shriver called to report fraudulent financial activity (1 page)
- File "CALLS_FOR_SERVICE_182490946" – record of call for service involving Mr. Shriver dated 9/06/2018; Mr. Shriver called to report female partner assaulted him (1 page) (duplicate)
- File "CALLS_FOR_SERVICE_182500765" – record of call for service involving Mr. Shriver's residence dated 9/07/2018; Mr. Shriver's girlfriend calling w/ questions about protection order 1 page)
- File "CALLS_FOR_SERVICE_182520455" – record of call for service involving Mr. Shriver's residence dated 9/09/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182530215" – record of call for service involving Mr. Shriver's residence dated 9/10/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182530597" – record of call for service involving Mr. Shriver's residence dated 9/10/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182540418" – record of call for service involving Mr. Shriver's residence dated 9/11/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182610152" – record of call for service involving Mr. Shriver's residence dated 9/18/2018; traffic stop (1 page)

- File "CALLS_FOR_SERVICE_182710920" – record of call for service involving Mr. Shriver's residence dated 9/28/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182720196" – record of call for service involving Mr. Shriver's residence dated 9/29/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182740482" – record of call for service involving Mr. Shriver's residence dated 10/01/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_182970779" – record of call for service involving Mr. Shriver dated 10/24/2018; Mr. Shriver called to report fraudulent financial activity (1 page)
- File "CALLS_FOR_SERVICE_183050348" – record of call for service involving Mr. Shriver dated 11/01/2018; Mr. Shriver called to report suspect information related to fraud (1 page)
- File "CALLS_FOR_SERVICE_183060461" – record of call for service involving Mr. Shriver's residence dated 11/02/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_183070209" – record of call for service involving Mr. Shriver's residence dated 11/03/2018; Mr. Shriver's girlfriend calling for civil standby (1 page)
- File "CALLS_FOR_SERVICE_183250662" – record of call for service involving Mr. Shriver dated 11/21/2018; Mr. Shriver called to report ongoing needs related to fraudulent financial activity (1 page)
- File "CALLS_FOR_SERVICE_183270694" – record of call for service involving Mr. Shriver's residence dated 11/23/2018; Mr. Shriver calling to ask for assistance removing subject from his home (same subj later suspected of stealing his motorcycle) (1 page)
- File "CALLS_FOR_SERVICE_183270771" – record of call for service involving Mr. Shriver's residence dated 11/23/2018; Mr. Shriver calling "anonymously" to again ask for assistance removing subject from his home (same subj later suspected of stealing his motorcycle) (1 page)
- File "CALLS_FOR_SERVICE_183380553" – record of call for service involving Mr. Shriver dated 12/04/2018; Mr. Shriver called to report ongoing needs related to fraudulent financial activity (1 page)
- File "CALLS_FOR_SERVICE_191750038" – record of call for service involving Mr. Shriver's residence dated 6/24/2019; neighbor calling to report sounds of a fight (1 page)
- File "CALLS_FOR_SERVICE_191810572" – record of call for service involving Mr. Shriver's residence dated 6/30/2019; Mr. Shriver reporting suspicious person riding bike in neighborhood (1 page)
- File "CALLS_FOR_SERVICE_191900016" – record of call for service involving Mr. Shriver dated 7/09/2019; report of motorcycle stolen (1 page) (duplicate)
- File "CALLS_FOR_SERVICE_191900062" – record of call for service involving Mr. Shriver dated 7/09/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_191900093" – record of call for service involving Mr. Shriver dated 7/09/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_191900300" – record of call for service involving Mr. Shriver dated 7/09/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_191921051" – record of call for service involving Mr. Shriver dated 7/11/2019; Mr. Shriver calling to report threats (1 page)
- File "CALLS_FOR_SERVICE_191921072" – record of call for service involving Mr. Shriver dated 7/11/2019; Mr. Shriver calling for follow-up (1 page)

- File "CALLS_FOR_SERVICE_191930033" – record of call for service involving Mr. Shriver dated 7/12/2019; Mr. Shriver calling to report text messages from suspect in motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_191930188" – record of call for service involving Mr. Shriver dated 7/12/2019; Mr. Shriver calling to complain about police not protecting his family (1 page)
- File "CALLS_FOR_SERVICE_191940849" – record of call for service involving Mr. Shriver dated 7/13/2019; Mr. Shriver calling to report text messages from suspect in motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_191940901" – record of call for service involving Mr. Shriver dated 7/13/2019; Mr. Shriver calling to report text messages from suspect in motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_191980352" – record of call for service involving Mr. Shriver dated 7/17/2019; Mr. Shriver calling to report text messages from suspect in motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_192061008" – record of call for service involving Mr. Shriver dated 7/25/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_192210732" – record of call for service involving Mr. Shriver dated 8/9/19; Mr. Shriver intoxicated, armed himself and confronted individuals at his home (2 pages) (duplicate)
- File "CALLS_FOR_SERVICE_192220490" – record of call for service involving Mr. Shriver dated 8/10/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_192280375" – record of call for service involving Mr. Shriver dated 8/16/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_192320646" – record of call for service involving Mr. Shriver dated 8/20/2019; Mr. Shriver calling for follow-up; reporting motorcycle driving by he believes associated with motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_192380638" – record of call for service involving Mr. Shriver dated 8/26/2019; Mr. Shriver calling for follow-up regarding motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_192430708" – record of call for service involving Mr. Shriver dated 8/31/2019; Mr. Shriver calling for follow-up regarding motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_192480005" – record of call for service involving Mr. Shriver dated 9/05/2019; neighbor called to report sounds of "things smashing and possibly someone being hit"; gun ran in call (1 page) (duplicate)
- File "CALLS_FOR_SERVICE_192480792" – record of call for service involving Mr. Shriver dated 9/05/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_192480809" – record of call for service involving Mr. Shriver dated 9/05/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_192490614" – record of call for service involving Mr. Shriver dated 9/06/2019; Mr. Shriver surrendering firearms (1 page)
- File "CALLS_FOR_SERVICE_192600689" – record of call for service involving Mr. Shriver dated 9/17/2019; Mr. Shriver calling for follow-up regarding motorcycle theft (1 page)
- File "CALLS_FOR_SERVICE_192600760" – record of call for service involving Mr. Shriver dated 9/17/2019; Mr. Shriver calling for follow-up (1 page)

- File "CALLS_FOR_SERVICE_192660825" – record of call for service involving Mr. Shriver dated 9/23/2019; Mr. Shriver called to report vehicle prowl (1 page) (duplicate)
- File "CALLS_FOR_SERVICE_193400563" – record of call for service involving Mr. Shriver dated 12/06/2019; Mr. Shriver calling for follow-up (1 page)
- File "CALLS_FOR_SERVICE_200260752" – record of call for service involving Mr. Shriver dated 1/26/2020; current event (2 pages) (duplicate)
- File CALLS_FOR_SERVICE_200260838" – record of call for service involving Mr. Shriver dated 1/26/2020; call related to current event (1 page)
- File "CALLS_FOR_SERVICE_200270635" – record of call for service involving Mr. Shriver's residence dated 1/27/2020' neighbor calling with concerns about Mr. Shriver's dog post-arrest (1 page)
- File "CALLS_FOR_SERVICE_200360335" – record of call for service involving Mr. Shriver dated 2/05/2020; Mr. Shriver surrendering firearms (1 page)
- File "OPD 2018-05436" – Olympia Police Department report for case 2018-05436 for 9/06/2018 call for service (18 pages) (duplicate)
- File "OPD 2019-04218" – Olympia Police Department report for case 2019-04218 for 7/09/2019 call for service (13 pages) (duplicate)
- File "OPD 2019-05011" – Olympia Police Department report for case 2019-05011 for 8/09/2019 call for service (8 pages) (duplicate)
- File "OPD 2019-05586" – Olympia Police Department report for case 2019-05586 for 9/05/2019 call for service (34 pages) (duplicate)
- File "OPD 2019-05998" – Olympia Police Department report for case 2019-05998 for 9/23/2019 call for service (5 pages) (duplicate)
- File "OPD 2020-00535" – Olympia Police Department report for case 2020-00535 for 1/26/2020 call for service – current case (35 pages) (duplicate)
- Folder "Transfer" ▯ RFP6 ▯ Locken
- File "ia2016004 final report" – Olympia Police Department Office of Professional Standards investigation A2016-004 (127 pages)
- File, "01 12 23 Corey Johnson_4pp" – transcript of deposition of Olympia Police Sergeant Corey Johnson (23 pages)
- File, "Jasonshriver_cond_N_ex" – transcript of deposition of Jason "Jake" Shriver dated 3/22/23 (79 pages
- File, "Dorcasgithinji_cond_N" – transcript of deposition of Dorcas Wanjiku Githinki dated 2/23/2023 (39 pages)

### Judicial Decisions

- *U.S. v. $129,727.00 U.S. Currency*, 129 F.3d 486 (9th Cir., 1997)
- *Garcia v. County of Merced*, 639 F.3d1206, 1209 (9th Cir. 2011)

**Statutes, Administrative Codes and Pattern Jury Instructions**

- RCW 9A.36.041 – Assault in the fourth degree
- RCW 9A.40.040 – Unlawful Imprisonment
- RCW 10.31.100 – Arrest without warrant
- RCW 10.99.020 – Definitions (DV)
- WPIC 35.19 – Unlawful Imprisonment – Definition
- WPIC 35.50 – Assault – Definition
- WPIC 39.16 – Unlawful Imprisonment – Elements

**Other Materials**

- *Confessions, Search, Seizure, and Arrest A Guide for Police Officers and Prosecutors*, Pam Loginsky, Staff Attorney for Washington State Association of Prosecuting Attorneys (May, 2015)
- *Introduction to Patrol Procedures – Officer Safety Concepts, Handout* distributed by the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy, July 16, 2009.
- *Prosecutors' Domestic Violence Handbook,* prepared by the Washington Association of Prosecuting Attorneys and the King County Prosecuting Attorney's Domestic Violence Unit (147 pages)
- *Domestic Violence Student Handbook (2008-06-05) DV (A-24)* – training resource on domestic violence from WACJTC/BLEA (91 pages)

## I.      FACTUAL BACKGROUND

Background Facts

On May 12, 2017, Khamla Martin transported Jason "Jake" Shriver to a medical appointment at Capital Medical Center in Olympia, Washington.[1] At that time, Ms. Martin was in a dating relationship with Mr. Shriver. When they arrived, they began to argue. The argument was brought to the attention of security staff at the hospital. Sean Kiteley was the security guard who responded to the disturbance.

According to Mr. Kiteley, he located Ms. Martin and Mr. Shriver in the lobby of the hospital. Mr. Shriver was being pushed in a wheelchair by Ms. Martin. Mr. Kiteley noted Mr. Shriver was yelling and cussing as they made their way toward the doctor's office. Mr. Kiteley offered to push the wheelchair so Ms. Martin could speak to hospital staff and get Mr. Shriver checked in. Mr. Kiteley was pushing the wheelchair when Mr. Shriver suddenly jumped from the chair and attacked him. Mr. Kiteley tried to fend off the attack by pushing Mr. Shriver; however, Mr. Shriver punched Mr. Kiteley multiple times in the face and chest. Mr. Kiteley used his arms to shield himself from the attack, during which time Mr. Shriver stated he had a handgun.

Mr. Kiteley called out to hospital staff for help and a nurse called 911. Mr. Shriver continued to yell, swear, and punch Mr. Kiteley. Ms. Martin heard the commotion and stepped between Mr. Shriver and Mr. Kiteley. Mr. Kiteley was able to retreat and ordered them to leave the property. Ms. Martin and Mr.

---

[1] See file OPD 2017-02699.

Shriver left the building and walked toward the parking lot. At some point during this time, Mr. Shriver discarded a handgun in the landscaping.

Olympia Police Officer Andrew Hansen was dispatched in response to the 911 call. Dispatchers told Officer Hansen that the security guard at the hospital "needed help ASAP." Officer Hansen responded to the scene and spoke with Mr. Kiteley, who told the officer what happened. Officer Hansen observed redness and swelling on Mr. Kiteley's arms and wrists. Mr. Kiteley walked with Officer Hansen to the lower parking lot of the property and pointed out Mr. Shriver. Officer Hansen noted Mr. Shriver was approximately six feet tall and weighed approximately 215 pounds.

Officer Hansen called out to Mr. Shriver and told him to come closer. At that time, Ms. Martin emerged, ran toward Mr. Shriver, and wrapped her arms around his waist. Officer Hansen ordered Ms. Martin to let go of Mr. Shriver. Ms. Martin refused and stated she was going to take Mr. Shriver home. Officer Hansen ordered Ms. Martin twice more to release Mr. Shriver and she refused. Officer Hansen had to physically separate Ms. Martin from Mr. Shriver before placing Mr. Shriver in handcuffs. Mr. Shriver told Officer Hansen he would find where the officer lived and kill him. Mr. Shriver then began to thrash around, which forced Officer Hansen to put Mr. Shriver on the ground and hold him there until other officers arrived.

Notably, Ms. Martin refused to provide a statement to police officers at the scene. After interviewing Mr. Kiteley, Officer Hansen placed Mr. Shriver under arrest for 4th degree assault. Officers later located Mr. Shriver's handgun near the scene of his arrest.

Ms. Martin later came to the police department and provided a written statement claiming the Mr. Kiteley made false claims about being assaulted.

Based on these events, an "Officer Safety" warning was created in the National Crime Information Center (NCIC) database identifying Mr. Shriver as a safety concern for law enforcement. The warning advised, "WARNING – A SUBJECT IN THIS RESPONSE HAS BEEN IDENTIFIED AS A VIOLENT OFFENDER OR A SERIOUS THREAT TO LAW ENFORCEMENT OFFICERS." The warning also noted Mr. Shriver, "THREATENED TO FIND OUT WHERE OFFICER LIVES AND KILL HIM."[2]

Domestic Violence History

On November 9, 2017, Mr. Shriver called 911 to request officers remove Ms. Martin from their shared home. Officers contacted Mr. Shriver and discovered he was "highly intoxicated." Officers determined no crime had been committed and no further action was taken. Officers were aware of the safety warning associated with Mr. Shriver at this time.

On September 6, 2018, Mr. Shriver called 911 to report Ms. Martin accused Mr. Shriver of cheating on him and bit Mr. Shriver's lip. Olympia Police officers responded and subsequently arrested Ms. Martin for assault in the 4th degree (domestic violence). Officers were aware of the safety warning associated with Mr. Shriver at this time.

The following day Ms. Martin called 911 to request assistance seeking a protective order against Mr. Shriver. The following week, Ms. Martin petitioned the Thurston County District Court for an order of protection. In her petition, Ms. Martin outlined a history and pattern of abuse by Mr. Shriver. Ms. Martin

---

[2] From file, "Shriver Officer Safety Info."

detailed Mr. Shriver's heavy drinking, incidents involving her being hit, punched, having her hair pulled, and being kicked in the head. Ms. Martin further wrote, "Things happen on a weekly basis. I get punished if I disclose the abuse. I've been isolated from family and friends. I've been hit on the forehead and eye…Respondent [Mr. Shriver] makes me feel like a failure if I don't have sex with him. I've told him no."[3] Ms. Martin further noted, "Respondent [Mr. Shriver] put a gun to my head while we lived in Rochester, WA. Police were called. This happened over two years ago."[4]

The court granted Ms. Martin's petition and issued a temporary order for protection.

On September 5, 2019, Olympia Police were called to Mr. Shriver's residence for a domestic assault. Neighbors called 911 to report, "sounds of things smashing and possibly someone being hit."[5] The 911 caller described the location to the 911 operator. Officer Luke O'Brien later wrote, "The reporting party was unsure of the physical address and described the house where the disturbance was occurring as the "second house on 5th Ave NW from Oso Berry St. NW, towards the west". Based on the reporting party`s description I was confident the house being described was 4318 5th Ave NW which I know to be the residence of Jason E. Shriver. I am familiar with the occupants of the home as I've responded to numerous police calls at this location."[6] As before, responding officers were aware of the officer safety information associated with Mr. Shriver.

Police officers arrived and contacted Mr. Shriver and his adult son. While on scene, officers discovered a shotgun and two handguns staged at various locations in the house. Mr. Shriver was arrested for assault in the 4th degree (domestic violence) and one count of malicious mischief/property damage (domestic violence).

Records reflect extensive contact involving Mr. Shriver between May 2017 and January 2020. During that period, police received approximately fifty calls related to Mr. Shriver or his residence.

Current event

By January 2020, Mr. Shriver and Ms. Martin were no longer involved. During this time, Mr. Shriver was living with his wife, Wanjiku Shriver, at the residence formerly shared with Ms. Martin. On the evening of January 26, 2020, Mr. Shriver called 911 to request officers remove his wife from their shared residence. The 911 call recording clearly reflects Mr. Shriver was highly intoxicated. Records later revealed his blood alcohol content was approximately .228. At some point during the 911 call, Mr. Shriver hung up on the operator. The operator attempted to call back, but Mr. Shriver did not answer.

Olympia Police Officers Tiffany Coates, Nicholas Smith, and Thomas Milavec initially responded to the call. As they were arriving, they were notified Mr. Shriver called 911 in response to the operator's prior attempt to call him back. Mr. Shriver denied ever calling 911 and told the operator police were not needed at the residence.

---

[3] See file, "Full page photo."
[4] Id.
[5] See file, "OPD 2019-05586."
[6] Id.

According to Officer Coates:

> Dispatch then relayed to officers on scene of a safety flag associated with the name Jason E. Shriver 02/23/1968; stating a serious threat to law enforcement. Dispatch relayed in the past Jason threatened to find out where an officer lives and kill him. Dispatch also relayed prior history at the residence which included a previous domestic violence. Dispatch also relayed there were firearms inside of the residence per a previous call.[7]

A surveillance camera on the exterior of Mr. Shriver's home captured one perspective of the events. The camera is oriented toward the driveway of the residence and only depicts exterior/porch/driveway area The camera does not capture the interior of the home. Upon arrival Officers Coates, Smith and Milavec approached the front door. Officer Coates knocked and Mr. Shriver answered the door. He was accompanied by a large Doberman Pinscher. Mr. Shriver immediately told Officer Coates, "Everything is ok." When Officer Coates asked how many people were in the house, Mr. Shriver replied, "Everything's fine." Officer Coates calmly told Mr. Shriver the officers needed to confirm everyone in the house was safe. Mr. Shriver began to yell at the officers and tell them they were not allowed in his home.

The officers saw a female, later identified as Mr. Shriver's wife, Wanjiku, appear behind him in the hallway. Officer Coates described Wanjiku as "timid and afraid."[8] Officer Smith noted, "Wanjiku appeared scared…".[9] According to officer Coates:

> I observed Wanjiku reach for the handle of the screen door to open it and come outside. As she reached for the handle, I observed Jake grab her by the right wrist using his left hand. He told her she was not going outside. Jake had a hold of her wrist for a few seconds. The initial grab resulted in her body being push backward. She stated she just wanted to come out and speak with us… She then began to retreat backwards out of my sight. Wanjiku then came back to the door where I observed her again reach for the door handle. Jake then put his arm out across her chest and stopped her from exiting. As he was attempting to stop her, the dog collar came off the dog which resulted in the dog going back down the hallway. Jake then lifted his arm away from the chest of Wanjiku and went to put the collar back onto the dog. Wanjiku was then able to exit out to us.[10]

Officer Smith later wrote:

> Officers told Wanjiku to come out and talk with us in order to separate her from Jake both parties. At this time, Wanjiku tried to walk out to us and Jake grabbed the female's right hand with his left hand in order to prevent her from leaving. The grab was firm and momentarily knocked Wanjiku

---

[7] From file, "Binder 012620 OPD 20-0535."
[8] Id at page 3.
[9] Id at page 8.
[10] Id at page 3.

> backwards. Wanjiku was trying to explain to Jake that she was going to talk to us. Wanjiku then back away from the door for a short time before walking to the door again and trying to step outside. When Wanjiku tried to leave the residence again, Jake, while holding his dog with his right hand, put his left arm in front of the female and told her something to the affect of "you are not going out there." The arm over the chest appeared to be a strike as it once again knocked Wanjiku backwards and another way to prevent Wanjiku from leaving the residence. As Jake was distracted by the dog he was holding by the collar in his right hand, Wanjiku was able to exit the residence and step outside with officers.[11]

The audio on the surveillance video captures Mr. Shriver repeatedly shout, "Don't open the door! Do *not* open the door!"[12] It is unclear whether Mr. Shriver is yelling at Wanjiku or the officers on the porch; however, based on the officers' reaction, it appears that when Mr. Shriver initially stopped Wanjiku from leaving, the officers grew concerned for her safety. The surveillance video depicts Officer Coates turn to the other officers and ask, "Ready to go in?" Officer Milavec replies, "Yep," as he steps toward the door.[13]

Up to this point, the Doberman had been barking constantly. As the officers move toward the door, the dog appears to bark more aggressively. Officer Coates pauses and states, "I do not want to get bit by a dog." The camera footage depicts Wanjiku appear at the door. The door opens and closes while it appears Wanjiku is having difficulty exiting the residence. Mr. Shriver yells at Wanjiku, "*Do not open the door*!"[14] Officer Smith tells Mr. Shriver, "Let her come out! Just let her come out!"[15] As Wanjiku is attempting to exit the home, Mr. Shriver shouts, "Yeah! This dog will bite your face off!" As Wanjiku squeezes through the open screen door, Mr. Shriver shouts, "Kinju are you fucking kidding me?"

In the video, Wanjiku claims she is fine. As she is attempting to speak with the officers on the porch, Mr. Shriver shoves the door open and shouts, "Kinju are you fucking kidding me? Are you fucking kidding me?" Mr. Shriver orders Wanjiku to "get in the house now!" Mr. Shriver tells Wanjiku, "They [the police officers] are not your friends…Really Kinju? Do you understand what you've done?"[16] As the officers attempt to separate Wanjiku from Mr. Shriver, he shouts, "*You motherfucking cocksuckers! Fuck you, you prick!*"[17]

Patrol Sergeant Corey Johnson arrived on scene and informed the officers he was familiar with the residence and he was aware there were firearms present in the residence. Since Wanjiku was separated from Mr. Shriver, Sgt. Johnson the officers to back away from the residence to safer positions of cover. Mr. Shriver continued to scream and rant at the police officers. The officers were eventually able to separate Wanjiku from the scene and retreat to positions of safety. Mr. Shriver refused to exit the residence at any point. Wanjiku told officers there was no assault prior to their arrival and they were only arguing. An associate of Mr. Shriver contacted police on scene and confirmed "there were at least two handguns, a shotgun, and a rifle in the house." However, Wanjiku told Officer Smith there had been

---

[11] Id at page 8.
[12] File, "DEFENSE VIDEO2 at :10.
[13] Id.
[14] File, "DEFENSE VIDEO2 at :26.
[15] Id at :30.
[16] Id at 1:31.
[17] Id at 1:42.

firearms in the house previously, but she hadn't seen any recently. Similar to Ms. Martin (discussed above), Wanjiku refused to provide a written statement, answer further questions, or complete any paperwork related to the investigation.

Based on Mr. Shriver physically preventing Wanjiku from leaving the residence, Officer Coates determined there was probable cause to arrest Mr. Shriver for unlawful imprisonment (DV) and assault in the 4th degree (DV). Based on Mr. Shriver's refusal to exit the residence, Officer Smith contacted Thurston County District Court Judge Brett Buckley to apply for a search warrant to enter Mr. Shriver's home and arrest him.

Officer Smith called Judge Buckley and explained the circumstances. After being placed under oath, Officer Smith explained the circumstances to the judge. The judge asked what Wanjiku told the officers. Officer Smith replied,

> [H]is wife has been uncooperative…[S]he stated earlier…in the evening they had a verbal argument…over his drunkenness state…[S]he picked him up from church, he was drunk. That is where their argument…happened, and it carried over to the house. He is very intoxicated. [S]he's been unable to provide us further information on if an assault occurred at the house. She says everything's been verbal. [B]ut myself and other officers witnessed the assault at the front door…when he grabbed her right hand and then a second time…put his left hand in front of her, preventing her from coming out to us.[18]

Judge Buckley asked, "And how long of a delay…did that cause?" Officer Smith replied, "[T]he delay was…a couple seconds…[S]he got struck, she moved backwards. And we were able to…halfway open the door and we were able to take her…toward the garage area. And then removed her from the scene as other officers were trying to contact Jason [Mr. Shriver] at the front door."[19]

Based on Officer Smith's sworn statements, Judge Buckley found probable cause and authorized the search warrant.

Based on the probable cause to arrest Mr. Shriver, his refusal to exit the residence, the officer safety bulletin associated with him, and the presence of firearms in the residence, the Thurston County SWAT team was summoned to the residence to assist. Upon arrival, SWAT officers assumed control of the warrant service. At approximately 3:04 am, Mr. Shriver was arrested. Officers recovered three boxes containing firearms from inside the residence.[20] Mr. Shriver later turned over four additional handguns to the Olympia Police Department.[21]

The case was presented to the Thurston County Prosecuting Attorney's Office and reviewed by Deputy Prosecuting Attorney Travis Kuhns. DPA Kuhns agreed there was probable cause to support criminal charges. Mr. Shriver was charged with one count of Unlawful imprisonment (DV) and one count of Assault in the 4th degree (DV) on January 29, 2020. On May 27, 2021, DPA Alexis Egolf moved the court to dismiss

---

[18] File, "Binder 012620 OPD 20-0535" at page 28-29.

[19] Id at page 28.

[20] See file, "Binder 012620 OPD 20-0535" at page 13.

[21] Id at pages 14-18

the criminal charges without prejudice.[22] The court granted the motion, and the criminal case was dismissed.

## II.      INTRODUCTION

The fundamental duty of domestic law enforcement in the United States is the resolution of crises. Substantial time, energy, and resources are allocated to training police officers in crisis resolution tactics, techniques, and procedures. In law enforcement, *crisis* is generally defined as a situation or event involving a substantial threat to public safety.[23] Law enforcement typically responds to three general class of crises: natural disasters (floods, landslides, tornadoes, etc.), mechanical crises (vehicle collisions, bridge failures, aviation events, etc.), and conflict.

General society operates according to traditional conceptions of conflict. Most conflicts in civilized matters deal with minor personal offenses involving rational actors with easily identifiable goals. Likewise, civilized conflict still operates according to generally accepted social norms. In our normal experience, common societal values, norms, and mores govern human interactions. Our relationships to others are generally predicted on behavioral assumptions based on a general set of shared values. These assumptions are widely followed and, generally, result in predictable, stable interactions among a wide range of actors. These assumptions are so common and widely accepted they are often taken for granted—so much so that we fail to consider them in our daily lives. For example, we assume a certain level of cooperation among one another. When an actor deviates from our expectations, we may struggle to understand his objectives or place the behavior in context. We also assume others will act rationally to achieve easily identified end-states or goals. We have little experience with irrational actors. That is, most laypersons fail to accurately comprehend or understand behaviors that are inconsistent with an easily identifiable goal.

For example, neighbors may have a conflict involving the property line between their homes. A resolution may involve discussion, negotiation, legal threats, or lawsuits. Though unpleasant, these strategies have been adopted by our legal institutions for resolving such matters. It would be "normal" for the conflict to be addressed in this manner. However, if one neighbor produces a handgun, this is a radical departure from our generally accepted conflict resolution strategies. This is where law enforcement is called upon. *Conflict* in law enforcement is generally defined as any situation involving an irreconcilable collision between opposing wills involving one or more suspects who must be captured or subdued. Conflict is the most common class of crisis involving law enforcement. It is also the most dangerous and complicated.

Law enforcement conflicts often involve irrational actors. The lay public often lacks meaningful experience with irrational actors. It is difficult to understand behaviors minimally correlated to desirable outcomes. Observers unfamiliar with irrational actors often ask, "Why would a person do that?" when observing or encountering non-normative behavior. This illustrates the assumption that there are readily identifiable, rational *reasons* why people behave in certain ways. With individuals high on drugs, suffering from mental illness, experiencing emotional disruption, or any combination thereof, there is often no rational

---

[22] Criminal cases may be dismissed "with prejudice" or "without prejudice." Where a case is dismissed "with prejudice," the disposition is final, and the case cannot be refiled. Where, as here, the case is dismissed "without prejudice," the case may be refiled at any time within the statute of limitations.

[23] For more on these concepts, see Heal, Charles "Sid," *Sound Doctrine*, Lantern Books, New York, NY (2000).

explanation for behavior. Attempting to impute rationality where none exists fails to recognize the reality of the situation.

Further, law enforcement conflicts involve an adversary purposefully engaged in thwarting the will of law enforcement involved resolution efforts. The interplay between these actors makes law enforcement conflict particularly difficult and complicated. It is also zero-sum: the success of one actor comes at the expense of the other. The suspect's actions will radically shape resolution strategies available to law enforcement.

All crises share five general characteristics. First, all crises are *confusing and uncertain*. The underlying causes are often years in the making. People do not generally wake up one day and decide to shoot up an elementary school. By the time law enforcement is involved, there is a rich history known only to the suspect and those closest to him/her. Law enforcement will almost always lack detailed information on the suspect's motives, intent, goals, capabilities, and skill. Further, the crisis location is almost always selected by the suspect. The police do not choose which school the shooter might select. Other uncertainties like time of day, weather, available personnel and resources, the capabilities of personnel on scene, and bystander actions further complicate matters. Because uncertainty is prevalent, decisions will always be made based on probabilities derived from inaccurate, untimely, incomplete, and often contradictory information.

Second, all law enforcement crises involve *risk*. Risk is defined as the potential for an outcome inconsistent with the intended goal of the action. This risk extends to the public, the suspect, and law enforcement personnel. Risk is further exacerbated by the actions of the suspect.

Third, law enforcement crises are both *time sensitive and time competitive*. If unaddressed, law enforcement crises will rarely resolve without causing some identifiable harm. The duration of law enforcement crises is relatively short and will require some intervention. Thus, some law enforcement action is generally appropriate. Because one actor is seeking to defeat the other, time will accrue to the benefit of the actor who can most quickly exploit circumstances to his benefit. "Time which is allowed to pass unused accumulates to the credit of the defender. He reaps what he did not sow."[24]

Time is a continuum in which events occur in an irreversible succession from past, through the present, and into the future. Time is highly transitory, temporary, and unique. Decisions delayed in these circumstances are often rendered ineffective because circumstances will have changed. Consequently, the actor who most readily exploits opportunity will gain significant advantage. "Opportunity" is defined as a period of time during which action will benefit one adversary at the expense of the other. Opportunities are often the result of planning, skill, or chance. The opposite is known as a window of vulnerability. Where opportunity exists for one actor, vulnerability necessarily exists for the other. Critically, opportunities cannot be exploited without proximity. Thus, to successfully leverage circumstances to one's benefit, the actor must be close enough to identify the opportunity and take action to exploit it.

Fourth, because law enforcement crises are uncertain, risky, and time competitive, law enforcement should endeavor to resolve them at the earliest possible opportunity. Prolonged operations tend to evolve toward disorder. Because decision-making is predictive, there will always be unintended outcomes. Each

---

[24] Clausewitz, Carl von, *On War*, Princeton University Press Edition (2008, reprinted).

occurrence will require revision and improvisation of the resolution strategy. Over time, these changes compound and make the encounter more complex and disordered.

Finally, because the fundamental characteristic of conflict is the irreconcilable disagreement between the suspect and authority, conflicts are especially susceptible to the *human factor*. Motives, emotions, personalities, training, experience, etc. are always considerations in developing and implementing resolution strategies.

### III. DISCUSSION, ANALYSIS AND OPINIONS

Law enforcement training is based on maintaining peace, facilitating safety, and restoring order. No matter the circumstances, these are always the desired end-states. Because law enforcement crises are so complicated and unpredictable, all law enforcement training is founded upon general principles and systematic practices aimed at reducing or eliminating variables that occur during crises.

### A. Response Protocols

#### "Priorities of Work"

In responding to law enforcement crises, police officers are trained to prioritize their efforts to maximize safety and the efficient allocation of resources. These *priorities* are: **1) render the scene safe/secure the scene, 2) render medical aid to the injured/triage casualties, 3) investigate crime.** Where police respond to a violent event, they are trained to focus primary efforts on the source of the violence. Once the source is identified, they are trained to take reasonable and appropriate measures to isolate it and mitigate harm. Once danger has abated, the attention focuses on treating the injured according to severity of injuries and likelihood of survival. Finally, with the scene secure and injured treated, police will focus on documenting events, interviewing witnesses, collecting evidence, etc.

#### Safety Priorities

When rendering a scene safe, police officers are trained to allocate risk according to those with most control over their fate. This principle is commonly known as the *life safety priorities* or *safety priorities*. Officers are trained to make decisions based on the following priorities in respective order of importance: 1**) the safety of innocent/uninvolved citizens, 2) the safety of responding officers, and 3) safety of the offender/source of the conflict.** This model allocates risk according to those with most control over their circumstances, "utilizing objective criteria based on an individual's current or likely risk of suffering serious bodily injury or death and their direct ability to remove themselves from that danger. Those exposed to the greatest potential of injury with the least ability to escape the situation are placed at the top of the priorities... On the other end of the continuum is the suspect, who has little threat of injury and absolute control over the situation [through his/her ability to surrender and/or cease the dangerous behavior]."[25]

According to this principle, an officer would place him/herself in peril to minimize danger to the public. For example, during an active shooter event at a school, injury from gunfire is a likely outcome. Successful law enforcement intervention may not entirely prevent this outcome, but it can likely mitigate it. An appropriately trained officer may enter the school and confront the shooter, thereby placing him/herself

---

[25] *Tactical Responses and Operations Standard for Law Enforcement Agencies*, Published by the National Tactical Officers Association, April, 2018.

in greater danger of being shot while also reducing the danger of innocent citizens being targeted. The officer may be forced to engage the shooter, increasing the likelihood the shooter is injured while further reducing the likelihood of injury to innocents. These are the "safety priorities" in action.

Lay persons tend to characterize outcomes in binary terms: there are "good" outcomes and "bad" outcomes. A good outcome might be winning a basketball game; a bad outcome might be losing. In law enforcement, outcomes are often varying degrees of "bad." A "good" outcome in law enforcement may still be objectively "bad" by normal standards. For example, consider a victim struck and critically injured by a drunk driver. The likely outcomes might range between death and survival as a double amputee. These are both "bad" outcomes; however, one is less "bad" than the other. Responding officers may have to choose between saving the person's life at the expense of their legs. This is often the paradigm in which police officers operate. It is vastly unfamiliar to the public and, consequently, leads to radical misconceptions on the tactics used by police officers.

Managing crises and unstable events necessarily requires extraordinarily difficult decisions. Oftentimes, the question is not, "Who will suffer?", as suffering is an inescapable part of policework. People engage in dangerous behavior that will inevitably place themselves and others in great danger and cause damage. Police officers, when called upon to mitigate these dangers, must often choose between the lesser of "bad" outcomes. Thus, the question is often, "Who will suffer less?"

## B.    Domestic Violence

Police officers spend a substantial amount of their time responding to, and investigating, domestic violence crime. Police officers are trained that domestic violence calls constitute up to 50% of 911 calls nationwide.[26] While police officers are trained in a variety of topics, particular attention is given to domestic violence. Police officers are trained to understand the broad impact domestic violence has on the community. "While the consequences of domestic violence to individuals are innumerable, the collective costs to the community are frequently hidden but unending. Domestic violence contributes to the systematic destruction of individuals and the family, the foundations of our society. The community pays a high price in the lost lives, not only of individual family members, but also of others."[27]

Beginning at the basic police academy, police officers are trained that "[d]omestic violence is a pattern of behavior that one person in a relationship uses to gain power and control over their current or former spouse, intimate partner, girl/boyfriend or family/household member. Domestic Violence is a broad category that includes behaviors ranging from seemingly trivial to lethal, inflicted mostly upon women. *Domestic violence (DV) is one of the most prevalent and serious crimes* handled by prosecutors across the country.[28]

Police officers are trained that, "**DV offenders are far more violent than the general offender population**; ***DV convictions are the greatest criminal predictor of future acts, and the greatest predictor of future violent crime.***"[29] Further, police officers are trained to understand the risk to officer safety inherent to domestic violence situations. Police training instruct officers that, "[m]any perpetrators injure not only

---

[26] Id at page 15.
[27] Domestic violence student handbook at page 11.
[28] *Prosecutors' Domestic Violence Handbook* at page 5.
[29] *Prosecutors' Domestic Violence Handbook* at page 6-7, emphasis in original.

their immediate victims *but also those who may be trying to intervene.* Family members, police, children, neighbors, shelter workers, employers and others, are often secondary victims of the batterer's violence."[30]

Police officers are trained that domestic violence is committed mostly by male offenders. Additionally, domestic violence suspects share several common characteristics inherent to the domestic violence dynamic: **they are often controlling, they act to isolate the victim, they "minimize, deny, and lie," they display "extreme jealousy, possessiveness, and a need for control," they frequently use/consume alcohol and/or drugs, and/or they have access to weapons, among several other characteristics**.[31]

Police officers are generally expected to use and exercise sound professional discretion; however, officer discretion is limited on domestic violence cases. Police officers in Washington State are trained that:

> Normally, officers have discretion (a choice) whether to arrest a suspect or not. In DV situations, whenever an arrest is mandated by law, the responding officer must arrest the suspect. Mandatory and discretionary arrest authority is governed by RCW 10.31, 10.99, and 26.50. RCW 10.31.100(2) states: "A police officer shall arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that [a specified domestic violence crime has occurred]." When the RCW says "shall" it means there is no choice.[32]

Because of the mandatory arrest provisions associated with domestic violence, police officers are trained to arrest domestic violence suspects where there is a good-faith basis to do so. Toward this end, police officers are trained to understand they shielded from liability when carrying out the intent of the legislature:

> No police officer may be held criminally or civilly liable for making an arrest pursuant to RCW 10.31.100(2) or (10) if the police officer acts in good faith and without malice. RCW 10.99.070 states: "A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident." RCW 26.50.140 states: "No peace officer may be held criminally or civilly liable for making an arrest under RCW 26.50.110 if the police officer acts in good faith and without malice.[33]

Police officers are trained to take a victim-centric approach to domestic violence calls. The Washington State Legislature has made this explicit: "It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate

---

[30] Domestic violence student handbook at page 11.
[31] Id at page 21.
[32] Id at page 35.
[33] Id at page 30.

the attitude that violent behavior is not excused or tolerated."[34] Police are trained to err on the side of victim safety. In fact, police officers are trained to understand they can be held liable for *failing* to make an arrest when investigating domestic violence crimes.

C.    Probable Cause – Generally

Police officers are trained extensively in the legal constructs required to conduct law enforcement activities under the federal and state constitutions, administrative codes, and department policies. "Probable cause" is a fundamental legal concept central to the basic duties of police officers. As such, police officers are heavily trained on the legal requirements, investigation, and development of probable cause related to both searches and arrest. Accordingly, police officers receive basic and ongoing training on the legal concept of "probable cause." Police officers are trained at the Washington State Basic Law Enforcement Academy that, "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a reasonable person to believe that a specific offense has been or is being committed by the person being arrested."[35]

In determining whether probable cause exists, police officers are trained to consider the entire universe of events known collectively at the time, including their personal knowledge, training, and experience and that of other officers involved in the event. This is commonly referred to as "the totality of circumstances" or "totality of the evidence" under Garcia. Further, under Garcia, police officers are trained that they do not have to exhaust every innocent explanation. Nor do they need to disprove all defenses in the probable cause calculus if the conclusions are reasonably based on the officer's training, experience and facts known to him/her at the time. Police officers with specialized knowledge, training, and experience are trained to rely on the sum total of their abilities to determine whether facts and circumstances rise to probable cause. Police training also recognizes that, "because otherwise innocent-looking conduct may convey different messages to a trained observer, the experience and knowledge of the [police officers] can be taken into account when determining probable cause."[36]

Further, police officers are trained that, **"[f]or information to amount to probable cause, *it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence. . .* police are not required 'to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence' that a suspect has committed a crime. All that is required is a 'fair probability,' given the totality of the evidence, that such is the case."[37]**

Additionally, police officers in Washington State are trained that probable cause is independent of any affirmative defense or justification. "Officers do not have a duty to evaluate the arrestee's self-defense claim or other affirmative defense to determine whether it vitiated the existence of probable cause."[38]

---

[34] Id ap page 32.

[35] Garcia v. County of Merced, 639 F.3d1206, 1209 (9th Cir. 2011) as contained in *Procedures of Arrest* (updated July 2020), training presentation sourced from the Washington State Basic Law Enforcement Curriculum.

[36] $129,727.00 U.S. Currency, at 489 citing United States v. Bernard, 623 F.2d 551, 560 (9th Cir. 1979).

[37] *Confessions, Search, Seizure, and Arrest: A Guide for Police Officers and Prosecutors*, May 2015 Edition, by Pamela B. Loginsky, Staff Attorney, Washington Association of Prosecuting Attorneys sourced from the WCJTC Basic Law Enforcement Curriculum, citing McBride v. Walla Walla County, 95 Wn. App. 33, 975 P.2d 129 (1999) (emphasis added).

[38] Id (emphasis added).

This is because the timing, nature and availability of such evidence is oftentimes known or available only to the suspect and beyond the reach of investigators during the investigation, if at all. Additionally, suspects oftentimes lie, distort, omit, or otherwise make claims hoping to deceive investigators or mitigate guilt. The effect of these efforts is often left to the jury to decide.

### Opinion 1 – Initial Response

As noted earlier, safety is the primary goal in all law enforcement responses. The "life safety priority" principle dictates officers take reasonable measures to secure victim safety first. Upon contacting Mr. Shriver, responding officers were advised Mr. Shriver had "been identified as a violent offender or serious threat to law enforcement officers." Officers were further advised that, during a prior encounter with a police officer, Mr. Shriver "threatened to find where the officer lived and kill him." Officers were further aware that Mr. Shriver called 911, then called back and denied he called previously.

Upon arrival, the officers had the opportunity to see Ms. Shriver was approximately six feet tall and weighed approximately 215 pounds. He was hostile and uncooperative. During the initial contact, Officers observed Wanjiku inside the residence. Two officers on scene described her as "timid," "afraid," and "scared." Mr. Shriver displayed several factors a reasonable officer investigating a domestic violence call would find concerning. As noted above, police officers are trained to recognize several behaviors indicative of a domestic violence relationship.

1) Domestic violence suspects are often controlling and display "extreme jealousy, possessiveness, and a need for control." Here, Mr. Shriver called the police to have his wife removed from his residence. When the police responded, he was highly uncooperative with the police investigation and attempted to forcefully prevent Wanjiku from cooperating as well. He threatened police officers ("Yeah! This dog will bite your face off!"), refused to exit the residence, and prevented his wife from exiting. Mr. Shriver ordered his wife, "*Do not open the door*!"[39]; "…get in the house now!"; ""Kinju are you fucking kidding me? Are you fucking kidding me?"

2) Domestic violence suspects act to isolate the victim. Mr. Shriver tried to restrain his wife from exiting the residence. When she did so, Mr. Shriver shouted to her, "They [the police officers] are not your friends…Really Kinju? Do you understand what you've done?"[40]

3) Domestic violence suspects minimize, deny, and lie. At the outset, Mr. Shriver called 911 to request officers remove Wanjiku from their shared home. Mr. Shriver hung up on the 911 operator, who, in turn, attempted to call him back. Mr. Shriver called 911 again and denied he called initially, then told the 911 operator, "everything is fine."

4) Domestic violence suspects frequently use/consume alcohol and/or drugs. Here, Mr. Shriver was clearly intoxicated during his contact with the police. Officers later discovered his blood alcohol content was .228. For reference, the law presumes a vehicle driver is impaired at .08. Mr. Shriver's blood alcohol content indicated he was *highly* intoxicated, which is consistent with his behavior and the observations made by responding officers.

---

[39] File, "DEFENSE VIDEO2 at :26.
[40] Id at 1:31.

5) Domestic violence suspects own or have access to weapons. Sgt. Johnson was aware Mr. Shriver possessed firearms based on prior interactions with Mr. Shriver at his residence. Once Mr. Shriver was arrested, officers recovered guns from within his home. Mr. Shriver turned over several additional guns to police pursuant a court order.

Based on these observations and considerations, a reasonable police officer would find several red flags necessitating further investigation. A reasonable police officer would not take Mr. Shriver's assurances that "everything is ok" at face value.

**In my opinion, a reasonable police officer under the same or similar circumstances would *not* simply walk away and leave a large, drunk, volatile, armed male alone with his "timid," "scared," and "afraid" wife. A reasonable police officer would separate the parties, render the scene safe, and investigate the matter further. The decision to remain at the residence and separate Wanjiku was reasonable, appropriate under the circumstances, and consistent with the law, generally accepted training principles, contemporary tactics, practices, policies, and procedures.**

### Opinion 2 – The Arrest Decision

In addition to the officer safety warning associated with Mr. Shriver, officers noted his demeanor and intoxication. According to Officer Coates:

> I observed Wanjiku reach for the handle of the screen door to open it and come outside. As she reached for the handle, I observed Jake grab her by the right wrist using his left hand. He told her she was not going outside. Jake had a hold of her wrist for a few seconds. The initial grab resulted in her body being push backward. She stated she just wanted to come out and speak with us.
>
> She then began to retreat backwards out of my sight. Wanjiku then came back to the door where I observed her again reach for the door handle. Jake then put his arm out across her chest and stopped her from exiting. As he was attempting to stop her, the dog collar came off the dog which resulted in the dog going back down the hallway. Jake then lifted his arm away from the chest of Wanjiku and went to put the collar back onto the dog. Wanjiku was then able to exit out to us.[41]

According to Officer Smith:

> Officers told Wanjiku to come out and talk with us in order to separate her from Jake both parties. At this time, Wanjiku tried to walk out to us and Jake grabbed the female's right hand with his left hand in order to prevent her from leaving. The grab was firm and momentarily knocked Wanjiku backwards. Wanjiku was trying to explain to Jake that she was going to talk to us. Wanjiku then back away from the door for a short time before walking to the door again and trying to step outside. When Wanjiku tried to leave the residence again, Jake, while holding his dog with his right

---

[41] File, "Binder 012620 OPD 20-0535" at page 3.

> hand, put his left arm in front of the female and told her something to the affect of "you are not going out there." The arm over the chest appeared to be a strike as it once again knocked Wanjiku backwards and another way to prevent Wanjiku from leaving the residence. As Jake was distracted by the dog he was holding by the collar in his right hand, Wanjiku was able to exit the residence and step outside with officers.[42]

Based on these observations, Officer Coates determined there was probable cause to arrest Mr. Shriver for unlawful imprisonment (DV) and assault in the 4th degree (DV). "A person is guilty of unlawful imprisonment if he or she knowingly restrains another person."[43] "A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another."[44]  As noted above, "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a reasonable person to believe that a specific offense has been or is being committed by the person being arrested."[45]  "For information to amount to probable cause, *it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence.* . . police are not required 'to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence' that a suspect has committed a crime. All that is required is a 'fair probability,' given the totality of the evidence, that such is the case."[46]

Here, a reasonable police officer under the same or similar circumstances would conclude there was probable cause to arrest Mr. Shriver. It is noteworthy that Officer Smith presented Judge Buckley with these facts. After asking Officer Smith a few clarifying questions, Judge Buckley agreed there was probable cause.

In my opinion, a reasonable officer under the same or similar circumstances would believe there was probable cause to arrest Mr. Shriver for unlawful imprisonment and assault in the 4th degree. The decision to arrest Mr. Shriver was reasonable, appropriate under the circumstances, and consistent with the law, generally accepted training principles, contemporary tactics, practices, policies, and procedures.

### Opinion 3 – The Decision to Seek a Search Warrant to Arrest Mr. Shriver

Due to Mr. Shriver's level of intoxication, his demeanor, the officer safety information known to the officers, the conflict between Mr. Shriver and Wanjiku, and the presence of firearms in the shared residence, a reasonable police officer would seek to arrest Mr. Shriver in furtherance of Wanjiku's safety. It is noteworthy that Mr. Shriver's arrest virtually eliminates the possibility that he would assault Wanjiku or anyone else that evening. Mr. Shriver's arrest also eliminates any possibility that Mr. Shriver would use or access any of the numerous firearms in the residence while in an intoxicated and agitated state.

---

[42] Id at page 8.

[43] RCW 9A.40.040.

[44] RCW 9A.36.041.

[45] Garcia v. County of Merced, 639 F.3d1206, 1209 (9th Cir. 2011) as contained in *Procedures of Arrest* (updated July 2020), training presentation sourced from the Washington State Basic Law Enforcement Curriculum.

[46] *Confessions, Search, Seizure, and Arrest: A Guide for Police Officers and Prosecutors*, May 2015 Edition, by Pamela B. Loginsky, Staff Attorney, Washington Association of Prosecuting Attorneys sourced from the WCJTC Basic Law Enforcement Curriculum, citing McBride v. Walla Walla County, 95 Wn. App. 33, 975 P.2d 129 (1999) (emphasis added).

Declining to arrest Mr. Shriver allows for numerous scenarios resulting in harm to Wanjiku, other members of the household, or members of the community.

In my opinion, where, as here, there is probable cause to arrest an intoxicated, volatile domestic violence suspect with immediate access to firearms, a reasonable police officer would do so. Thus, the decision to seek a search warrant to facilitate Mr. Shriver's arrest was reasonable, appropriate under the circumstances, and consistent with the law, generally accepted training principles, contemporary tactics, practices, policies, and procedures.

### Opinion 4 – The Decision to Call SWAT

As noted earlier, police officers are trained to tailor police tactics according to the safety of the victim/uninvolved citizens, the safety of the officers, and the safety of the suspect, respectively. Under the circumstances, Mr. Shriver's refusal to surrender and exit a location where firearms were present created a "barricaded subject" situation. "A barricade situation may be defined as the standoff created by an armed or potentially armed suspect in any location, whether fortified or not, who is refusing to comply with lawful orders for surrender."[47]

Potentially armed individuals within a structure present a host of tactical concerns that exceed the training and equipment capabilities of traditional patrol units. Tactical teams (i.e. "SWAT") possess equipment such as enhanced armor, body armor, diversionary devices, enhanced breaching equipment, night vision equipment, technology (e.g. unmanned drones, remote control surveillance, etc.), and chemical munitions unavailable to patrol officers. Additionally, SWAT officers have advanced training in the use, deployment, and tactics associated with this equipment. It would be an exceptional departure from generally accepted practices for a patrol group to attempt to extract and armed, barricaded subject without assistance from SWAT or similarly trained tactical personnel.

According to best practices promulgated by the National Tactical Officers Association:

> Special Weapons and Tactics (SWAT) and Tactical Response (TRT) teams are designated law enforcement teams, whose members are recruited, selected, trained, equipped and assigned to resolve critical incidents involving a threat to public safety, which would otherwise exceed the capabilities of traditional law enforcement first responders and/or investigative units…[the] SWAT team is the designated entity to be activated for SWAT-specific incidents such as hostage situations, **barricade incidents** or other high-risk situations requiring specialized capabilities.[48]

Here, the Olympia Police Department does not have a SWAT team. Tactical support is provided by the Thurston County Sheriff's Office. Thurston County Sheriff's Office policy provides guidelines for the use of their SWAT personnel:[49]

1) The suspect has committed a criminal act or is in a dangerous mental condition.
2) The suspect is believed to be armed.
3) The suspect has refused to submit to arrest.

---

[47] *Tactical Responses and Operations Standard for Law Enforcement Agencies* at page 40 (emphasis added).
[48] Id at page 12.
[49] See file, "Final SWAT Agreement signed by all agencies" at page 10.

4) By the nature of the situation, an unacceptable risk is presented to the deputies or the public by using any other accepted means.

5) Any other situation deemed appropriate by the Sheriff or designee.

Additionally, Thurston County Sheriff's Office Policy provides, "It shall be the policy of this Office that a tactical team may be mobilized in the following situations:[50]

1) Hostage incidents.
2) **Barricaded subject incidents.**
3) Sniper incidents.
4) Riots or **situations requiring chemical agents.**
5) **High risk arrest situations**, or as directed by the Sheriff or designee

It is noteworthy that the SWAT response was predicated on Mr. Shriver's refusal to exit the residence and surrender to the officers. *If not for his refusal to surrender*, a SWAT team would be unnecessary. Further, Mr. Shriver's refusal to surrender would be directly related to the tactics, techniques, and procedures used to arrest him as well as the length of time the arrest operation would take.

It is my opinion that a reasonable police officer under the same or similar circumstances would characterize Mr. Shriver's refusal to exit the residence and surrender as a "barricaded situation" or "barricaded subject." It is further my opinion that generally accepted police practices dictate a tactical response for a barricaded situation. The decision to summon the Thurston County SWAT team to facilitate Mr. Shriver's arrest was reasonable, appropriate under the circumstances, and consistent with the law, generally accepted training principles, contemporary tactics, practices, policies, and procedures.

## IV.    PREVIOUS EXPERT TESTIMONY AND REPORTS

- City of Kirkland, Washington
  Usandivaras v. City of Kirkland, et al. – Excessive force claim
  Report generated/Deposition given

- Pierce County Sheriff's Officer, Pierce County Washington
  Estate of Regina Annas et al. v. Pierce County – Wrongful death/failure to act claim
  Report generated/Deposition given

- Pierce County Sheriff's Office, Pierce County, Washington
  Estate of Jessica Ann Marie Ortega v. Pierce County – Wrongful death/failure to act claim
  Report generated/Deposition given

- City of Spokane, Spokane, Washington
  Joseph E. Hensz v. City of Spokane, et al. – Excessive force claim
  Report generated

- City of Kirkland, Washington
  Carol Jones v. City of Kirkland, et al. – Excessive force claim
  Report generated

---

[50] Id (emphasis added).

- City of Spokane, Washington
  Sean M. Driver v. The City of Spokane et al. – Excessive force claim
  Report generated

- Thurston County Sheriff's Office, Thurston County, Washington
  Estate of Joel A. Nelson v. Thurston County, et al. – Wrongful death claim
  Report generated

- City of Lakewood, Washington
  Mykah Ward and Meosha Turner v. City of Lakewood, et al. – Wrongful arrest/police procedures claim
  No report generated

- City of Lynnwood, Washington
  Thurston Myers v. City of Lynnwood et al. – Wrongful arrest/police procedures claim
  Report generated

- City of Kent, Washington
  Linda Poplawski v. City of Kent, et al. – Wrongful arrest/police procedures claim
  Report generated

- City of Sedro Wooley, Washington
  Armen Beeman v. City of Sedro Woolley – Wrongful arrest/police procedures claim
  Report generated

- City of Auburn, Washington
  Ralph Sabininano v. City of Auburn. et al. – Wrongful arrest/police procedures claim
  No report generated

- City of Spokane, Washington
  Jackie Akins Sr, et al. v. The City of Spokane – Wrongful arrest/police procedures claim
  Report generated

- Washington State Department of Fish and Wildlife
  Shopbell, et al. v. Washington State Department of Fish and Wildlife, et al. – Wrongful arrest/police procedures claim
  Report generated/Deposition given

- City of Forks, Washington
  Joshua Hills and the Estate of Edward Hills, et al. v. Michael Gentry et. al. – Wrongful death claim
  Report generated

- City of Yakima, Washington
  Gary Dobbs v. City of Yakima, et al. – Wrongful arrest/police procedures claim
  Report generated

- Naphcare, Inc., Birmingham, AL
  Estate of Demaris Rodrigues et al. v. South Correctional Entity, et al. – Wrongful death claim
  Report generated

- City of Spokane, Washington
  Aaron L. Bell v. City of Spokane, et al. – Wrongful arrest/police procedures claim
  Report generated/testimony US Dist. Ct.

- Jefferson County Sheriff's Office, Jefferson County, Washington
  Patrick McAllister v. Jefferson County – Wrongful arrest/police procedures/malicious
  prosecution claim
  Report Generated

- Spokane County, Washington
  Estate of Benjamin Grosser et al., v. Spokane County – Wrongful death claim
  Report generated

- Spokane County, Washington
  ARW et al., v. Spokane County – Police procedures claim
  No report generated

- City of Buckley, Washington
  Estate of Quincy Bishop v. City of Buckley
  No report generated

- City of Lakewood, Washington
  Choi v. City of Lakewood – Wrongful arrest/police procedures claim
  Report generated

- City of Centralia, Washington
  Estate of Joshua Flores v. City of Centralia – Wrongful death/police procedures claim
  Report generated/Deposition given

- City of Tacoma, Washington
  Kristi Croskey v. City of Tacoma
  Pierce County Superior Court
  Report generated

- City of Tacoma, Washington
  Estate of Manny Ellis, et al., v. City of Tacoma – Wrongful death/police procedures claim
  No report generated

- Pierce County, Washington
  Estate of Manuel Ellis v. Pierce County
  No report generated

- Okanogon County, Washington
  James and Angela Faire v. Okanogon County – Wrongful arrest/police procedures claim
  Report generated

- Yakima County, Washington
  Estate of Jose M. Garcia v. Yakima County – Wrongful death/police procedures claim
  No report generated

- City of Kent, Washington
  Sina Ghodsee et al., v. City of Kent – Police procedures claim
  No report generated

- City of Fife, Washington
  Geraldine Hickman v. City of Fife – Police procedures claim
  Report generated/Deposition given

- City of Spokane, Washington
  Estate of David Novak, et al., v. City of Spokane – Wrongful death/police procedures claim
  Report generated/Deposition given

- City of Lakewood, Washington
  Estate of Said Joaquin v. City of Lakewood - Wrongful death/police procedures claim
  No report generated

- City of Tacoma, Washington
  Estate of Jacqueline Salyers, et al., v. City of Tacoma - Wrongful death/police procedures claim
  Report generated/Deposition given

- City of Sedro-Woolley, Washington
  Gerry Taylor v. City of Sedro-Woolley – Wrongful arrest/police procedures claim
  No report generated

- City of Montesano, Washington
  Estate of Patrick West, et al., v. City of Montesano, et al. – Wrongful death/police procedures claim
  No report generated

- Washington State Parks and Recreation Commission
  Dale Garcia, et al. v. Thomas Benenati, et al. – Wrongful arrest/police procedures claim
  Report generated

- City of Kent, Washington
  Estate of Joseph McDade et al., v. City of Kent - Wrongful death/police procedures claim
  Report generated/Deposition given

- City of Winthrop, Washington
  Geralds v. City of Winthrop et al. – Wrongful arrest/police procedures claim
  No report generated

- City of Arlington, WA
  Gutierrez v. City of Arlington – wrongful detention
  Report generated

- City of Auburn, WA
  Allen v. City of Auburn – excessive force
  Report generated

- City of Kent, WA
  Ascencio v. City of Kent – Police pursuit
  No report generated

- City of Redmond, WA
  Estate of Andrea Churna v City of Redmond – wrongful death/police practices
  Report Generated

- City of Tacoma, WA
  Cothran v. City of Tacoma – wrongful death/police procedures
  No report generated

- City of Kent, WA
  Estate of Sergey Pavlovic v. City of Kent – wrongful death
  Report generated/Deposition given

- Island County, WA
  Perillo v. Island County – police practices/negligent investigation
  No report generated

- Snohomish County, WA
  Estate of Nikolas Peters v. Snohomish County - Police pursuit/use of force/police procedures
  No report generated

- Pierce County, WA
  Provencher v. Pierce County – police pursuit
  Report generated

- Pierce County, WA
  Denton v. Pastor – use of force
  No report generated

- King County, WA
  Mitzel v. King County – police practices/tactics
  Report generated

- Oakland County, MI
  Wilson v. Oakland County Sheriff's Office – use of force
  No report generated

- City of Seattle, WA
  Smith v. City of Seattle – wrongful death
  No report generated

- City of Vancouver, WA
  Abbe v. City of Vancouver – wrongful death/use of force
  No report generated

- City of Vancouver, WA
  Hunter v. City of Vancouver – wrongful death/use of force
  No report generated

- King County, WA
  Gizachew Wondie v. King County – police practices
  Report generated

- City of Auburn, WA
  Estate of Enosa Strickland v. City of Auburn, et al. – wrongful death/police practices
  Report generated

- City of Longview, WA
  Estate of Justin Tofte v. Longview et al. – wrongful death/police practices
  No report generated

- Alameda, CA
  Estate of Gonzalez v. City of Alameda et al – wrongful death/use of force/police procedures
  No report generated

- State of Washington v. Christopher Burbank
  Report generated/Deposition given

- City of Washougal, WA
  Jeffrey Bethune v. City of Washougal et al – wrongful arrest/police procedures
  Report generated

- Washington State
  Blasche v. Washington State Patrol – vehicle pursuit/police procedures
  No report generated

- Landerholm, PS – police procedures
  Daybreak Youth Services v. Landerholm, PS
  Report generated/Deposition given

- City of Centralia, WA
  Erin McPeak v. Butcher, et al. – police procedures
  Report generated

- City of Lynnwood
  Alexander et al., v. City of Lynnwood et al. – Police procedures
  No report generated

- Clark County, WA
  Hanks v. Clark County– police procedures
  Report generated

- Pierce County, WA
  Crowe and Gerking v. Pierce County et al. – police pursuit
  Report generated

- Yakima, WA
  Orozco v. Yakima – police procedures
  No report generated

- City of Tacoma, WA
  Galvan v. City of Tacoma
  No report generated

- Washington State
  Parker v. Washington State Patrol
  Report generated

- Washington State Patrol – police procedures/wrongful arrest
  Sanchez v. Washington State Patrol
  Report generated

- City of Fircrest, WA
  Frederick v. Fircrest
  No report generated

## Compensation

The billable rate for case review, consult and report preparation in the current case is $350/hour. Deposition and courtroom testimony are billed at $400/hour.

_____

Chris M. Nielsen                    5/7/2023

# CHRIS M. NIELSEN

27200 272ND Ave SE #129, Ravensdale, WA 98051
(425) 681.1674          Chris@valorrg.com

## EDUCATION

***Juris Doctor, cum laude***                                                          2005
Syracuse University College of Law                                    Syracuse, NY

>   Honors: National Civil Trial Team, ATLA National Trial Team, Class of 2005 Dean's Scholar, Wason Scholar

**MA, Political Science**                                                              2005
Maxwell School of Citizenship and Public Affairs, Syracuse University          Syracuse, NY

**BA, Psychology, *Cum laude,* with distinction**                      2002
 University of Washington                                                  Seattle, WA

>   Honors:, Phi Beta Kappa, Mary Gates Scholar, Indonesian Field Research Scholar Psi Chi (National Honor Society in Psychology), Annual Dean's List

>   Honors Thesis: Predator Perception in Macaca fascicularis (Long-Tailed Macaque Monkeys)

>   Activities: National Undergraduate Research Symposium, primate field research, Tinjil Island, Indonesia

## PROFESSIONAL/EXPERT PRESENTATIONS

- Washington Association of Prosecuting Attorneys—featured speaker on force encounters, human performance/physiological responses to stress and tactical decision making under stress/ force encounters.

- King County Prosecuting Attorney's Office—CLE presentation on considerations for prosecutors on street-level police force encounters, human perception under stress and cognitive function in police officers during force encounters

- Renton Police Department—case law update, including current search/seizure and use of force case law.

- KCSO 25 Years of Air Support—featured speaker in media production focusing on tactical and patrol applications of King County Sheriff's Office Guardian 1 and 2 helicopters.

- Bellevue Police Department—featured presenter on investigative techniques involving civil asset forfeiture/seizure.

- TacOps East/National Capital Region SWAT Association –Mitigating and Reducing Liability in Tactical Operations & Leadership Lessons in Barricade Suspect Operations

[1]

### PROFESSIONAL EXPERIENCE

**City of Renton**                                                                    2011 – Present
Patrol Sergeant                                                                      Renton, WA

Patrol Sergeant                                                            March 2021 – Present

- Direct supervisor of patrol group; duties include:
    - Implementing administrative directives; supervising personnel and ensuring compliance with statutory, policy and generally accepted procedural and tactical principles in patrol operations
    - Evaluating the performance of police officers, drafting and documenting performance evaluations
    - Reviewing police reports for statutory and policy compliance, including use of force reports, pursuit reports and investigative reports
    - Reviewing training application requests
    - Managing staffing levels and time management software
    - Managing training requirements
    - Responding to citizen queries and complaints
    - Managing patrol/community outreach efforts
    - Managing equipment needs

Valley Regional SWAT                                          February 2015 – February 2021

- National Tactical Officer's Association (NTOA) certified active shooter instructor
    - Instruct police officers of all levels in response protocols to mass casualty events.
- Approximately 4,000 hours of tactical training and operational experience in the following areas:
    - Residential building assaults/clearing using covert, deliberate and dynamic techniques
    - Commercial building assaults/clearing using covert, deliberate and dynamic techniques
    - Surround and call-out tactics
    - Barricaded subject tactics
    - Hostage rescue
    - High-risk search warrant service
    - High-risk mobile/static vehicle arrest
    - Mass transit hostage rescue response
    - Counter terrorism/mass casualty response
    - High-risk fugitive apprehension
    - Chemical munitions
    - Mechanical breaching
    - Ballistic breaching
    - Certified high-energy/explosive breacher
    - Mobile surveillance techniques
    - NVG (night vision) rifle/pistol tactical techniques
    - NVG (night vision) residential/commercial clearing techniques
    - Close quarter combat techniques

[2]

- Woodland operations/NVG woodland operations
- Mission planning, implementing and execution
- Officer rescue techniques
- Dignitary protection
- Close-cover operations
- Advanced CQB techniques
- Less-lethal munitions
- Armor vehicle operation
- Firearms instructor
- Specialty Training Courses
  - Force Science Institute—the study of human performance during high-stress events
    - Human Dynamics and Conflict Resolution (2 days consisting of 16 instructional hours)
    - Force Science Analyst Certification (5 days consisting of 40 instructional hours)
    - Force Science Advanced Specialist Certification (18 weeks consisting of approximately 300 instructional and clinical hours).
  - Combat first-aid
  - WSTOA SWAT Basic Academy (instructor)
  - NTOA Active Shooter Instructor Course
  - DARC Counter-terrorism regional response protocols
  - Glock armor course
  - Lethal force legal update (ongoing)
  - CIT Intervention—dealing with subjects in mental crisis
  - Mobile/static Surveillance techniques
  - DEA narcotics interdiction
  - DOJ National Trial Advocacy Center advanced criminal litigation
  - NTOA "Train the Trainer" mass casualty/active shooter/workplace violence response
  - Tap-Rack Tactical SWAT Team Leader Course

Special Operations Division—Directed Enforcement Team                June 2015 – March 2021

- Officer in Charge (OIC); responsible for supervision and administrative oversight of special operations personnel; responsibilities included reviewing and approving tactical operational plans, reviewing investigation plans, monitoring vehicle pursuits; reviewing officer reports, including use of force reports, pursuit reports, officer injury reports; drafting performance evaluations; reviewing and approving staffing levels; implementing administrative directives, and ensuring compliance with statutory, policy and generally accepted procedural and tactical principles in special operations.
- Proactive unmarked "street crimes" enforcement including narcotics investigations, fraud, identify theft, auto theft and burglary, among other crimes.
- Fugitive location and apprehension
- Focus on and resolve "quality of life" crimes such as street level narcotics dealing, public intoxication, lewd conduct, graffiti abatement, residential nuisances, etc.
- Develop and maintain relationships with community stakeholders, business owners, etc.
- Provide tactical support to detectives, surveillance, patrol operations and undercover (UC) operations
- Mounted bicycle patrol

[3]

<u>Investigations and Patrol Operations</u>                                              August, 2011 – June 2015

- Respond to calls for service, including calls involving homicide/death, sexual assault, assault,     domestic violence, subjects in crisis, disorderly subjects, traffic collisions, missing/runaway persons, theft/fraud, animal complaints, crowd control, burglary, robbery, citizen assists, among others.
- Drafting police reports, search warrants, asset forfeiture, etc.
- Required to be familiar with criminal investigation techniques/best practices, criminal procedure, evidence collection, tactical theory, crime scene management, department policies/procedures, defensive tactics, firearms, less/non-lethal force options, etc.
- Emergency vehicle operation and vehicle pursuit tactics including Pursuit Intervention Technique (PIT), vehicle blocking, high-risk vehicle stops, etc.
-  Counseled department members on legal update/current case law

**Washington State Tactical Officers Association (WSTOA)**                       2018 – 2021
Adjunct Instructor

- Instruct classroom and practical application exercises in fundamental tactics, techniques and procedures to recently selected SWAT officers in tactical fitness, mechanical breaching techniques, less lethal force, APR/gasmask applications, terrain analysis, perimeters and approaches, immediate action drills, barricade operations, chemical agent exposure and application, site identification and scouting, structure clearing/CQB tactics and techniques, arrest team tactics, vehicle rescue/officer down tactics, combat first aid, hostage rescue tactics and techniques, among other basic subjects.

**Maple Valley CrossFit**                                                     Maple Valley, WA
Coach/Co-Owner                                                                  2014 – 2019

- Basic instruction of the CrossFit methodology to a diverse population of athletes, including first responders and military personnel; shared responsibility for all phases of business operations including membership, recruitment/retention, create/implement/maintain business model, purchase/acquisition of inventory/supplies, recruit/train/schedule staff, facility maintenance, marketing/promotions, accounting, customer service, etc. CrossFit Level 2 Instructor

**City of Bothell**
**Port of Seattle**
**Kent Police Department**
**Valley Narcotics Enforcement Team**
Hearing Examiner                                                             2009 – Present

- Administrative/judicial officer presiding over asset forfeiture proceedings pursuant to RCWs 69.50.505 and 10.105.010. Review pleadings, legal motions and preside over administrative hearings pursuant to Title 34 RCW. Issue findings of fact and conclusions of law and other administrative duties pursuant to listed statutes.

[4]

**Washington State Criminal Justice Training Commission**          Burien, WA
Adjunct Instructor                                                 2006 – 2013

- Consult on curriculum, lecture and administer practical exercises related to courtroom testimony block of instruction. Lead discussions and interactive instruction related to such topics as direct examination, cross examination, courtroom procedure/decorum, roles/responsibilities of courtroom personnel, strategies for effective testimony, identification and avoidance of common courtroom mistakes, effective report writing, etc.

**King County Prosecuting Attorney's Office**                      Seattle, WA
Deputy Prosecuting Attorney, WSBA # 36662                          Sept. 2005-March 2011
                                                                   May 2004-Aug. 2004

- Assignments:
  - Special Operations/Case Development
  - Violent Crimes trial team
  - Narcotics trial team
  - Domestic Violence trial team
  - Car-Theft Initiative
  - Misdemeanor/District Court
  - Juvenile trial team
- Responsible for all phases of criminal prosecution. Duties included:
  - Asset forfeiture
  - Search warrant drafting/review
  - Investigative consulting/case development
  - Initial charging determinations/case review
  - Plea negotiations
  - Witness interviews
  - Legal research/drafting legal memoranda and motions
  - Providing court calendar coverage
  - All phases of criminal prosecution through the trial and appellate stages.
  - Experience includes over 40 felony jury trials, 20 misdemeanor and numerous bench trials in matters ranging from misdemeanors to Class A felonies.
- Assigned to Eastside Narcotics Task Force (ENTF)
  - Provided legal counsel to UC detectives in counter-narcotics investigations/operations
  - Drafted/assisted drafting search warrants, UC wire orders, asset forfeiture/seizure pleadings, seizing documents for financial institutions
  - "Vertical Prosecution" of cases (controlling criminal prosecution from investigative phase through final disposition)
- Specialty Training Courses:
  - DOJ National Advocacy Center criminal trial attorney curriculum
  - DEA vehicle interdiction/narcotics detection
  - Seattle PD Undercover School narcotics manufacturing bloc
  - Advanced trial techniques for prosecution of domestic violence
  - Advanced trial techniques for DNA evidence
  - Electronic surveillance

[5]

o Presenting forensic evidence
o Trial techniques for prosecuting narcotics manufacturing (methamphetamine, "crack" cocaine, LSD, marijuana, ecstasy, etc)
o Dynamics of domestic violence relationships, trial strategies and victim considerations

**Valor Resource Group**                                                   Maple Valley, WA
Principle                                                    September 2017 - Present

- Continuing training, consulting and litigation strategies to law enforcement agencies, prosecuting authorities and non-government organizations in matters related to law enforcement tactics, training and procedures; providing legal representation to select clients

## AWARDS AND RECOGNITION

- 2019 American Legion Co-Officer of the Year
- 2019 Medal of Valor recipient
- Numerous commendations and letters of recognition

## PROFESSIONAL AFFILIATIONS

- Washington State Tactical Officers Association (WSTOA) Member
- National Tactical Officers Association (NTOA) Member
- Washington State Bar Association (WSBA) member in good standing
- California Narcotics Officer Association

## INTERESTS/HOBBIES

CrossFit Level 2 Instructor, United States Parachute Association (USPA) rated skydiving coach, mountain biking, mountaineering, hiking, running, snowboarding, obstacle course racing, skydiving, motocross, backcountry snowmobiling; successful summits of several mountains throughout Cascade Range, completed several road and obstacle races ranging from 5k to full marathons.

[6]



**CHRIS M. NIELSEN, MA, JD**
27200 272ND Ave SE #129, Ravensdale, WA 98051
(425) 681.1674        Chris@valorrg.com

## FEE SCHEDULE

Thank you for your interest in Valor Resource Group (VRG). VRG provides a variety of services to government and non-government partners. We specialize in law enforcement-related matters, including leadership consulting, litigation strategies, expert witness services, risk management and hearing examiner services. VRG strives to meet your needs at the highest professional level. The rates listed below are effective January 1, 2020. Please contact us for specialty services and projects where our unique expertise may further your mission.

- Expert review and consulting services — $3,500 retainer, which includes 10 hours for initial case review, interviews, and case conferences, $350/hr thereafter.
  - $450/hr depositions and courtroom testimony
- Leadership/management consulting—starting at $350/hr
- CLE, specialty training and guest speaking— $150-$350/hr plus costs.
- Travel
  - Airfare billed business class with one checked bag
  - Lodging and per diem billed at current GSA rates for your city/region
  - Travel time:
    - Pacific Time Zone $250/day
    - Central Time Zone $350/day
    - Eastern Time Zone $500/day

\* HOURLY RATES BILLED IN 1/10-HOUR INCREMENTS.
\*\* CONTACT DIRECTLY FOR SPECIALTY TRAINING AND OTHER SERVICES

A sample of recent subject matter expert and consultation cases include:

1. City of Auburn, Washington
   Aikins et al., v. City of Auburn
   Wrongful arrest/police procedures

2. City of Auburn, Washington
   Allen v. City of Auburn
   Use of force/police procedures

3. Pierce County, Washington
   Estate of Regina Annas v. Pierce County
   Wrongful death/use of force/police procedures

4. Spokane County, WA
   ARW et al., v. Spokane County
   Negligent investigation/police procedures

5. City of Kent, WA
   Ascencio v. City of Kent, et al.
   Police pursuit/police procedures

6. City of Sedro Woolley, WA
   Beeman v. City of Sedro Woolley
   Wrongful arrest/police procedures

7. City of Spokane, WA
   Bell v. City of Spokane
   Wrongful arrest/use of force/police procedures

8. City of Buckley, WA
   Estate of Quincy Bishop v. City of Buckley
   Wrongful death/use of force/police procedures

9. Tacoma Police Officer Chris "Shane" Burbank
   State of Washington v. Burbank
   Use of force/police procedures

10. City of Lakewood, WA
    Choi v. City of Lakewood
    Use of force/police procedures

11. City of Redmond, WA
    Estate of Andrea Churna v. City of Redmond
    Wrongful death/use of force/police procedures

12. City of Tacoma, WA
    Cothran v. City of Tacoma
    Police procedures

13. City of Tacoma, WA
    Crosky v. City of Tacoma
    Police procedures

14. Pierce County, WA
    Denton v. Pastor
    Use of force

15. City of Yakima, WA
    Dobbs v. City of Yakima
    Negligent investigation/police procedures

16. City of Spokane, WA
    Driver v. City of Spokane
    Use of force/police procedures

17. Pierce County, WA
    Estate of Manuel Ellis v. Pierce County
    Use of force/police procedures

18. City of Tacoma, WA
    Estate of Manuel Ellis v. City of Tacoma
    Use of force/police procedures

19. Okanogan County, WA
    Faire v. Okanogan County
    Negligent investigation/police procedures

20. City of Centralia, WA
    Estate of Joshua Flores v. City of Centralia
    Wrongful death/use of force/police procedures

21. Washington State Parks and Recreation Commission, WA
    Garcia v. Benenati et al.
    Use of force/police procedures

22. City of Yakima, WA
    Estate of Jose Garcia v. City of Yakima
    Wrongful death/use of force/police procedures

23. City of Winthrop, WA
    Geralds v. City of Winthrop
    Wrongful arrest/use of force/police procedures

24. City of Kent, WA
    Ghodsee v. City of Kent
    Use of force/police procedures

25. Spokane County, WA
    Estate of Benjamin Grosser v. Spokane County
    Wrongful death/negligent investigation/police procedures

26. City of Arlington, WA
    Gutierrez v. City of Arlington
    Wrongful arrest/police procedures

27. City of Spokane, WA
    Hensz v. City of Spokane
    Police pursuit/use of force/police procedures

28. City of Forks, WA
    Estate of Edward Hills v. City of Forks
    Wrongful death/use of force/police procedures

29. City of Fife, WA
    Hickman v. City of Fife
    Police pursuit/police procedures

30. City of Kirkland, WA
    Jones v. City of Kirkland
    Police pursuit/use of force/police procedures

31. City of Lakewood, WA
    Estate of Said Joquin v. City of Lakewood
    Wrongful death/use of force/police procedures

32. City of Kent, WA
    Estate of Giovonn Joseph-McDade v. City of Kent
    Police pursuit/wrongful death/use of force/police procedures

33. Jefferson County, WA
    McAllister v. Jefferson County
    Negligent investigation/wrongful prosecution/police procedures

34. King County, WA
    Mitzel v. King County
    Use of force/negligent investigation/police procedures

35. City of Lynnwood, WA
    Myers v. City of Lynnwood
    Negligent investigation/police procedures

36. Thurston County, WA
    Estate of Joel Nelson v. Thurston County
    Wrongful death/use of force/police procedures

37. City of Spokane, WA
    Estate of David Novak v. City of Spokane
    Wrongful death/use of force/police procedures

38. Pierce County, WA
    Estate of Jessica Ann Marie Ortega v. Pierce County
    Wrongful death/negligent investigation/police procedures

39. City of Kent, WA
    Estate of Sergey Pavlovic v. City of Kent
    Wrongful death/Police procedures

40. Island County, WA
    Perillo v. Island County
    Negligent investigation/police procedures

41. Snohomish County, WA
    Estate of Nikolas Peters v. Snohomish County
    Police pursuit/use of force/police procedures

42. City of Kent, WA
    Poplawski v. City of Kent
    Wrongful arrest/negligent investigation/police procedures

43. Pierce County, WA
    Provencher v. Pierce County
    Police pursuit/police procedures

44. Naphcare, Inc.
    Estate of Demaris Rodriguez v. South Correctional Entity (SCORE) et al.
    Wrongful death/police procedures

45. City of Auburn, WA
    Sabininano v. City of Auburn
    Negligent investigation/wrongful arrest/police procedures

46. City of Tacoma, WA
    Estate of Jacqueline Salyers v. City of Tacoma
    Wrongful death/use of force/police procedures

47. Washington State Department of Fish and Wildlife, WA
    Shopbell v. Washington State Department of Fish and Wildlife
    Negligent investigation/wrongful arrest/police procedures

48. City of Sedro Woolley, WA
    Taylor v. Sedro Woolley
    Use of force/police procedures

49. City of Kirkland, WA
    Usandivaras v. City of Kirkland
    Wrongful arrest/use of force/police procedures

50. City of Lakewood, WA
    Ward et al., v. City of Lakewood
    Negligent investigation/wrongful arrest/police procedures

51. City of Montesano, WA
    Estate of Patrick West v. City of Montesano
    Wrongful death/use of force/police procedures