1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    DORCAS GITHINJI and JASON                CASE NO. C22-5138 MJP
      SHRIVER,
11                                             ORDER GRANTING
                        Plaintiffs,            DEFENDANTS' MOTION FOR
12                                             PARTIAL SUMMARY JUDGMENT
              v.
13
      OLYMPIA POLICE DEPARTMENT,
14    et al.,

15                      Defendants.

16

17

18         This matter comes before the Court on Defendants' Motion for Partial Summary

19   Judgment. (Dkt. No. 73.) Having reviewed the Motion, Plaintiffs' Opposition (Dkt. No. 86), the

20   Reply (Dkt. No. 92), the Surreply (Dkt. No. 98), and all supporting materials, the Court

21   GRANTS the Motion.

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# BACKGROUND

**A.    Factual Background**

On the evening of January 26, 2020, Plaintiff Jake Shriver called 911 and reported he was having trouble with his wife, Plaintiff Dorcas Githinji, and could not have her in his house anymore. (Exhibit 1 to the Declaration of John Justice (Dkt. No. 74-1) (911 call recording).) Roughly ten minutes later, Shriver called 911 back to say that he did not need assistance. (Ex. 3 to the Declaration of Jonah Campbell ISO Mot. to Exclude (Dkt. No. 78-3 at 3).)  Officers nevertheless arrived on the scene. This included Defendant Officers Tiffany Coates, Nathan Smith, and Thomas Milavec. (See Justice Decl. Exs. 3 & 5 (Dkt. No. 74-3, 74-5) (video footage).) As Plaintiffs concede, the officers had probable cause to investigate a possible domestic violence dispute. (Pls. Mot to Exclude at 2 (Dkt. No. 76).)

One of the key disputed issues in the case is whether Shriver assaulted and unlawfully imprisoned Githinji before she was able to leave the home to speak with officers. Video records show Officers Coates, Milavec, and Smith arrive at the house. (See Justice Decl. Ex. 3.) Coates knocked on the door and began speaking with Shriver through what appears to be a closed screen door. (Id.) Shriver told Coates that "everything is fine," while his Doberman Pinscher barked loudly in the background. (Id.) Coates responded: "We just need to make sure everyone is okay, and we're not going to go away until that happens." (Id.) While Coates talked, Smith and Milavec stood nearby on the porch, and another officer, Vasile Kovzun, arrived on the scene. (Id.; Coates Dep. at 26 (Dkt. No. 74 at 7).) Sometime after the officers began talking with Shriver, Githinji exited through the door to speak with the officers. From the video, it appears that Githinji left on her own accord, unimpeded by either Shriver or the officers. But Coates wrote in a post-incident report that before Githinji successfully left the house, Shriver had

"grab[bed] her by the right wrist using his left hand" for a few seconds and "told her she was not going outside." (Dkt No. 87-1 at 4 (Coates' OPD Report).) This caused Githinji to be "pushed backward" and when she attempted to exit the house for a second time, Shriver "put his arm out across her chest and stopped her from exiting." (Id.) Officer Smith similarly wrote in his post-incident report that as Githinji "tried to walk out to us . . . [Shriver] grabbed [her] right hand with his left hand in order to prevent her from leaving." (Dkt. No. 87-1 at 7.) Smith explained that "[t]he grab was firm and momentarily knocked [Githinji] backwards." (Id.) Consistent with Coates' report, Smith stated that Shriver attempted to impede Githinji from the leaving the house when she again tried to leave, but that Shriver became "distracted by the dog" and Githinji "was able to exit the residence and step outside with officers." (Id.) Both Shriver and Githinji dispute the Officers' version of the facts and maintain that Shriver did not impede or assault Githinji. (Declaration of Dorcas Githinji ¶ 3 (Dkt. No. 88); Declaration of Jake Shriver ¶ 8 (Dkt. No. 89).)

The video recording provided by the Parties sheds only limited insight into whether Shriver assaulted or detained Githinji. The recording captures Shriver say, "do not open the door" and warned the officers that his "dog will bite your face off." (Justice Decl. Ex. 5.) The video also shows that Githinji exited the home without any assistance from any of the officers. (Id.) As Githinji left, Shriver yelled "[Githinji] are you fucking kidding me?!" (Id.) Coates testified that Githinji was "extremely timid" and "did not want to be near the dog." (Coates Dep. at 41 (Dkt. No. 74 at 8).) Smith's report also contains the observation that Githinji "appeared scared." (Dkt. No. 87-1 at 7.) But Githinji avers that she was not scared of Shriver during the incident and was "merely startled at being awoken late at night to find police at my door." (Githinji Decl. ¶ 2.) The video appears to confirm this, as Githinji explained calmly to the officers that "I'm fine" and "everything is ok." (Justice Decl. Ex. 5.) She also explains that "the

1   dog is really dangerous." (Id.) The video also shows that after Githinji left the house, Shriver

2   became more upset and increasingly yelled profanities at the officers and demanded Githinji

3   return. (Id.)

4          Sergeant Johnson arrived on the scene after Githinji exited the home and warned officers

5   that he was aware Shriver possessed firearms based on an earlier visit. (Justice Decl. Ex. 6.)

6   Although he had not seen the alleged assault, Johnson told the other officers to back out and take

7   cover. (Id.) Johnson ordered the other officers to remove Githinji from the porch, and the video

8   shows officers Milavec and Kovzun place hands on and physically remove Githinji, though the

9   video shows little more. (Id.) Johnson testified in his deposition that he wanted to back away

10  from the home with Githinji given his fear of the dog and prior knowledge of Shriver's gun

11  ownership and he was informed about the assault either before or shortly after he ordered the

12  retreat. (Johnson Dep. at 52.) Smith's written report states that "Kovzun walked [Githinji] to a

13  patrol vehicle where she was secured." (Dkt. No. 87-1 at 7.) Smith's report confirms that he was

14  the officer who kept Githinji and asked her about the incident. (Id.) According to Smith, Githinji

15  explained that Shriver was heavily intoxicated and the two had been having a purely verbal

16  argument about his level of intoxication. (Id. at 8.) Githinji assisted officers by calling Shriver

17  and asking him to exit. (Id.) But Shriver refused to exit. Officers detained Githinji for several

18  hours during which she did not believe she was free to leave. (Githinji Decl. ¶¶ 1, 4.) She spoke

19  to two officers who she claims did not listen to or accept her statement that Shriver "did not

20  assault me in any way and that he has never assaulted me or engaged in any violence against

21  me." (Id. ¶ 4.)

22         Unable to coax Shriver out of the home, Officer Smith applied for a search warrant from

23  a Thurston County Judge via telephone. (Dkt. No. 87-1 at 8.) During the call, Smith stated that

24

1   Githinji appeared scared and when she "tried to walk out to us, and [Shriver] grabbed [her] right

2   hand in order to prevent her from leaving." (Ex. 4 to the Declaration of Jonah Campbell (Dkt.

3   No. 78-4 at 3).) He told the Judge that Githinji "backed away for a second from the door for a

4   short time" and that "when [Githinji] tried to walk out again to talk to us, [Shriver], while

5   holding his dog with his right hand, put his left hand in front of [Githinji] and told her something

6   to the effect of 'you're not going out there.'" (Id.) Smith claimed "[t]he arm over the chest

7   appeared to be a strike, as it once again knocked her backwards" though Githinji "was able to

8   open the door and step outside." (Id.)

9         In response to the Judge's inquiry about what Githinji believed had happened, Smith

10   testified that Githinji "has been uncooperative," and that she had "been unable to provide us

11   further information on if an assault occurred in the house." (Dkt. No. 78 at 5.) But Smith also

12   testified that Githinji explained that they had been having only a verbal argument about Shriver's

13   intoxicated state. (Id.) And in response to the Judge's inquiry of how long Shriver detained

14   Githinji in the home, Smith testified it was "a couple [of] seconds." (Id.) After Smith confirmed

15   that he had sufficient belief that he had witnessed an assault and unlawful imprisonment, the

16   Judge found probable cause to issue a search warrant to detain Shriver in his residence. (Id.)

17         After Smith obtained the warrant, Johnson called the SWAT team who then used a

18   substantial amount of force to arrest Shriver and take him into custody. (Dkt. No. 87-1 at 5, 8.)

19   After the incident, the officer defendants debriefed the incident. As Johnson testified, they

20   officers did a "debrief of how the – you know, the night played out, what we could do better[.]"

21   (Johnson Dep. at 76-77 (Dkt. No. 87-2).)

22         After Shriver's arrest, the Thurston County Prosecutor filed charges against Shriver. The

23   Prosecutor's probable cause statement relied on the "available law enforcement reports,

24

statements, photographs and/or other evidence" that were attached to her declaration. (Dkt. No. 87-4.) The exhibit Plaintiffs provide of the probable cause statement includes only Smith's report as an attachment, not Coates' report. The Prosecutor then obtained a no-contact order on January 27, 2020, which was not rescinded until May 27, 2021, sixteen months later. (Albert Decl. Ex. 10.) The charges against Shriver were also dismissed that same month. (Third Amended Complaint (TAC) ¶ 4.7 (Dkt. No. 81).)

**B.    Procedural Background**

Plaintiffs pursue a series of state law and federal claims against the Olympia Police Department, Smith, Coates, Milavec, and Johnson. First, they allege a negligence claim against the individual officers for violating their "'duty of reasonable care when carrying out their official duties.'" (Pl. Resp. at 11 (quoting Mancini v. City of Tacoma, 196 Wn.2d 864, 879 (2021); see TAC ¶¶ 5.1-5.7.) Second, Plaintiffs pursue claims under 42 U.S.C. § 1983 for violations of their federal civil rights under the Fourth and Fifth Amendments. (TAC ¶¶ 6.1-6.6, 7.1-7.2.) Plaintiffs plead these as two separate causes of action, where "Count 2" identifies the Fourth and Fifth Amendment, while "Count 3" invokes § 1983. The Court construes these claims as individual claims brought under § 1983, one of which is premised on violations of the Fourth Amendment, while the other is premised on violations of the Fifth Amendment. Third, Plaintiffs allege a claim for false arrest. (TAC ¶¶ 8.1-8.3.) Lastly, they allege a loss of consortium claim. (TAC ¶¶ 9.1-9.3.) And although Plaintiffs had pleaded excessive force and tort claims against the Thurston County Sheriffs' Office for the SWAT team's role in Shriver's arrest, they settled and dismissed the claims.

1      Except as to Smith, Defendants move for summary judgment on all but the loss of

2   consortium and false arrest claims. (See Mot.; Reply at 10-11 (withdrawing challenge to loss of

3   consortium claim).)

4                                    **ANALYSIS**

5   **A.      Summary Judgment Standard**

6          Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

7   file, and any affidavits show that there is no genuine issue as to any material fact and that the

8   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

9   an issue of fact exists, the Court must view all evidence in the light most favorable to the

10  nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

11  Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

12  sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

13  moving party bears the initial burden of showing that there is no evidence which supports an

14  element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

15  Once the movant has met this burden, the nonmoving party then must show that there is a

16  genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

17  existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

18  matter of law." Celotex, 477 U.S. at 323-24.

19  **B.      Claims Against Olympia Police Department**

20         Defendants move for summary judgment on Plaintiffs' § 1983 claims against OPD. In

21  response, Plaintiffs concede that OPD is not the correct entity to be sued. (Pls. Resp. at 9-10.)

22  That is because "municipal police departments and bureaus are generally not considered

23  'persons' within the meaning of 42 U.S.C. § 1983." United States v. Kama, 394 F.3d 1236, 1240

24

ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 7

(9th Cir. 2005) (Ferguson, J., concurring). Plaintiffs thus "stipulate" that their federal civil rights claims ("Counts 2 and 3") should be construed as claims against only the individual officers. (Id. at 9.) On this basis, the Court GRANTS summary judgment in OPD's favor as to Plaintiffs' § 1983 claims.

Defendants also seek summary judgment on Plaintiffs' state law claims asserted against OPD on the theory that Washington law does not permit such claims against police departments. (Mot. at 6.) Plaintiffs again concede that OPD cannot be sued under state law. This is unsurprising given that only a city or county can be sued, not its police departments. See Dixson v. City of Issaquah Police Dep't, No. 2:22-CV-1771 RAJ, 2024 WL 97327, at *2 (W.D. Wash. Jan. 9, 2024) (collecting cases); Nolan v. Snohomish County, 59 Wn. App. 876, 883 (1990). The Court therefore GRANTS summary judgment in OPD's favor as to all of the state law claims alleged against it. This leaves no claims against OPD, and it is no longer a party to this action.

Without separately moving for relief or citing any authority, Plaintiffs argue that they should be permitted to substitute the City of Olympia as the proper defendant for liability. The Court DENIES this request without prejudice. Plaintiffs cite to no authority that would allow them to make this request in response to summary judgment. It is improper. Should Plaintiffs wish to pursue this request, they must do so by separate motion. If Plaintiffs determine to file such a motion, they must clarify exactly which, if any, of the claims they seek to pursue against the City of Olympia. The Court notes that the City should be named solely for purposes of respondeat superior liability, which is not a separate cause of action. See Niece v. Elmview Grp. Home, 131 Wn.2d 39, 48–50 (1997) (Washington recognizes respondeat superior as a theory of liability, not a cause of action). And the City cannot be held vicariously liable for any § 1983 claims. See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978) (finding

1  no vicarious liability for a municipal "person" under 42 U.S.C. § 1983). Plaintiffs will also need

2  to demonstrate sufficient diligence to allow this late amendment under both Rules 15 and 16.

3  **C.    Negligence**

4         Plaintiffs' clarify that their negligence claim turns on the assertion the individual officers

5  "negligently advance[ed] the misrepresentation that Mr. Shriver assaulted Ms. Githinji, which

6  led to Mr. Shriver's arrest at the hands of [the] Thurston County Sheriff's Officer and a no-

7  contact order separating the couple for 16 months." (Pls. Resp. at 11.) With this narrowing, the

8  Court finds that all three officers who have moved for summary judgment are entitled to that

9  relief as to this claim.

10        First, Plaintiffs point to no evidence that Coates' allegedly false representation about

11 witnessing an assault harmed either Shriver or Githinji. The Court finds no evidence that Coates'

12 observations factored into the issuance of the arrest warrant. At most, Plaintiffs identify Coates

13 as having filed a police report after the incident. But the Prosecutor's probable cause

14 declaration—as filed by Plaintiffs—refers only to the attached report prepared by Smith. (See

15 Campbell Decl. Ex. 4 (Dkt. No. 87-4 at 2).) Plaintiffs have therefore failed to provide any

16 evidence that Coates' report or belief about the assault led to Shriver's arrest. On this basis, the

17 Court GRANTS summary judgment in Coates' favor on the negligence claim.

18        Second, there are no facts presented that show Milavec was involved in the arrest of

19 Shriver. This is true even if the Court considered the excerpt of Milavec's deposition testimony

20 that Plaintiffs belatedly filed well after their response was due. (See Ex. 1 to the Declaration of

21 Gregory W. Albert (Dkt. No. 94-1).)[1] It is true that Milavec witnessed the alleged assault and

22

23 ─────────────────
   [1] The Court does not formally consider the improperly and late-filed testimony. The Court
24 GRANTS Defendants' request and STRIKES the late-filed declaration. (Dkt. No. 94.)

1   seized Githinji during the incident. But Plaintiffs offer no evidence about how he caused Shriver

2   to be arrested. And while Milavec was involved in detaining Githinji, Plaintiffs do not premise

3   their negligence claim on her detention. As such, the Court GRANTS summary judgment in

4   Milavec's favor on the negligence claim.

5          Third, Defendants are correct that there are no facts showing that Johnson negligently

6   advanced any misrepresentations that Shriver assaulted Githinji. The video evidence shows that

7   Johnson arrived on the scene well after the alleged assault occurred. (See Justice Decl. Ex. 5.)

8   And Johnson testified that he did not speak with anyone before he arrived, and that the officers

9   there told him about the assault at or around the time as he ordered them to move away from the

10  door and detain Githinji. (Johnson Dep. at 39, 52 (Dkt. No. 87-2).) So while Johnson was the one

11  who called in the SWAT, he did so based on the other officers' claim there had been an assault

12  and the fact Smith had obtained a search warrant based on that same representation. (Id. at 64.)

13  Without any personal involvement in the alleged misrepresentation, Johnson cannot be liable for

14  negligence as Plaintiffs have framed the claim. The Court GRANTS summary judgment in

15  Johnson's favor on the negligence claim.

16  **D.     Fourth Amendment Claims**

17         Plaintiffs' Opposition identifies four violations of the Fourth Amendment: (1) false

18  testimony and fabrication of evidence; (2) malicious prosecution; (3) unlawful seizure without

19  probable cause; and (4) civil rights conspiracy. The Court analyzes these claims in turn.

20         **1.     False Affidavit**

21         The Fourth Amendment requires that "information put forth [to the neutral judge] is

22  believed or appropriately accepted by the affiant as true." Franks v. Delaware, 438 U.S. 154, 165

23  (1978). "It is established law, that a warrant affidavit must set forth particular facts and

24

1  circumstances underlying the existence of probable cause, so as to allow the magistrate to make

2  an independent evaluation of the matter." Id. (citation omitted). Knowingly or recklessly

3  providing false information to the neutral judge violates the Fourth Amendment. See id. at 171-

4  72. To prevail on a § 1983 claim that an affiant knowingly or recklessly provided false

5  information to the judge, the plaintiffs do not need to establish that the investigating officer had

6  specific intent to deceive the issuing judge. See Lombardi v. City of El Cajon, 117 F.3d 1117,

7  1124 (9th Cir. 1997). The plaintiff must: (1) establish that the warrant affidavit contained

8  misrepresentations or omissions material to the finding of probable cause, and (2) make a

9  "substantial showing" that the misrepresentations or omissions were made intentionally or with

10  reckless disregard for the truth. Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir.

11  2011).

12         While there is a dispute of fact as to whether Smith submitted false information to the

13  Judge who issued the warrant and to the Prosecutor, Plaintiffs provide no evidence that Coates,

14  Johnson, or Milavec submitted any information in support of the warrant, arrest, or prosecution.

15  As such, the Court GRANTS summary judgment in all three Officers' favor as to this claim.

16        **2.**    **Malicious Prosecution**

17         To prevail on a malicious prosecution claim, the plaintiff "must show that the defendants

18  prosecuted her with malice and without probable cause, and that they did so for the purpose of

19  denying her equal protection or another specific constitutional right." Freeman v. City of Santa

20  Ana, 68 F.3d 1180, 1189 (9th Cir. 1995), as amended on denial of reh'g and reh'g en banc (Dec.

21  29, 1995). "A police officer who maliciously or recklessly makes false reports to the prosecutor

22  may be held liable for damages incurred as a proximate result of those reports." Blankenhorn v.

23  City of Orange, 485 F.3d 463, 482 (9th Cir. 2007). Indeed, even "a coroner's reckless or

24

1    intentional falsification of an autopsy report that plays a material role in the false arrest and

2    prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth

3    Amendment." Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126–27 (9th Cir. 2002). But

4    "where police officers do not act maliciously or with reckless disregard for the rights of an

5    arrested person, they are not liable for damages suffered by the arrested person after a district

6    attorney files charges unless the presumption of independent judgment by the district attorney is

7    rebutted." Blankenhorn, 485 F.3d at 482 (citation and quotation omitted).

8           First, Plaintiffs have failed to identify any facts showing that Coates recklessly submitted

9    a false statement that was material to Shriver's prosecution. While Coates did prepare a report

10   that contains a statement she witnessed an assault, Plaintiffs have failed to provide any evidence

11   that the Prosecutor relied on her report or that was involved in Shriver's prosecution. The only

12   report that appears to have factored into the prosecution was prepared by Smith. (See Dkt. No.

13   87-4.) As such, the Court GRANTS summary judgment in Coates' favor as to this claim.

14          Second, as to both Johnson and Milavec, there are no facts showing that they made any

15   statements that were used to prosecute Shriver. As such, the Court GRANTS summary judgment

16   in Johnson's and Milavec's favor as to this claim.

17          The Court separately addresses Defendants' argument that this claim was not sufficiently

18   pleaded in the Third Amended Complaint to be considered at summary judgment. While the

19   TAC is hardly a model of clarity, it includes sufficient allegations to find the claim pleaded.

20   First, the TAC alleges that as a result of the false allegations made by the officers, Shriver was

21   prosecuted for domestic violence and separated from Githinji for 16 months. (TAC ¶ 4.7.) And in

22   their Fourth Amendment claim, Plaintiffs allege that "Defendants . . . knowingly provid[ed] false

23   information to a judge in order to obtain a search warrant[.]" (Id. ¶¶ 6.5-6.6.) While thin, this

24

1   serves an adequate basis on which to have asserted the claim, given that the core facts

2   surrounding the claim are the presentation of false information to the Judge. But, given the

3   Court's Order, the claim may proceed against Smith alone.

4       **3.    Unlawful Seizure**

5       Defendants seek summary judgment on the theory that neither Coates, Milavec, nor

6   Johnson caused an unlawful seizure, and that there can be no Fourth Amendment claim. The

7   Court agrees only as to Coates.

8       The Fourth Amendment guarantees the right of the people to be free from unreasonable

9   seizures. U.S. CONST. amend. IV. "[T]he Fourth Amendment [also] protects individuals from . .

10  . unreasonable detentions" that do not amount to an arrest. See Bernal v. Sacramento Cnty.

11  Sheriff's Dep't, 73 F.4th 678, 686 (9th Cir. 2023). "The rule defining when the Fourth

12  Amendment permits seizures is well-established: absent an exception, the government may not

13  detain an individual unless there is, at a minimum, reasonable suspicion the individual is

14  engaging in criminal activity." Id. For those who are only detained, but not arrested, the question

15  "is whether their seizure was reasonable notwithstanding the lack of reasonable suspicion." Id.

16  This "reasonableness of [the plaintiff's] detention 'depends on a balance between the public

17  interest and the individual's right to personal security free from arbitrary interference by law

18  officers.'" Id. (quoting Brown v. Texas, 443 U.S. 47, 51 (quotation omitted))). The Court

19  "weigh[s] 'the gravity of the public concerns served by the seizure, the degree to which the

20  seizure advances the public interest, and the severity of the interference with individual liberty.'"

21  Id. (quoting Brown, 443 U.S. at 51).

22      One issue this claims presents is whether an officer who merely directs a detention or

23  seizure can be liable under § 1983 for violating the Fourth Amendment. "Section 1983 liability

24

1   extends to those who perform functions integral to an unlawful search, even if their individual

2   actions do not themselves rise to the  level of a constitutional violation." Bravo, 665 F.3d at

3   1089–90 (quotation omitted). But "the 'integral participant' doctrine does not implicate

4   government agents who are 'mere bystanders' to an unconstitutional search." Id. (quoting

5   Blankenhorn, 485 F.3d at 481 n.12.

6       There are sufficient facts here to allow the Fourth Amendment claims to proceed as

7   Johnson and Milavec, but not Coates.

8       First, as to Githinji's detention, there is sufficient evidence to show that both Johnson and

9   Milavec played integral roles. While Johnson did not necessarily know whether there had been

10  an assault, he relied on the other officers' reports and ordered Githinji to be detained based on

11  the situation he faced and on a prior interaction with Shriver that suggested he had weapons in

12  the home. Milavec was also one of two officers who led Githinji away from the home. Both

13  therefore had an integral role in Githinji's detention and the jury would need to determine

14  whether there were sufficient public interest to justify the detention. But the Court finds no

15  evidence presented that Coates had any role in Githinji's detention. The Court therefore

16  GRANTS summary judgment in Coates' favor only as to this claim.

17      Second, as to Shriver's arrest, the facts presented to the Court support a claim against

18  only Johnson. Johnson was the Sergeant who placed the request for SWAT to arrive and assist in

19  Shriver's arrest. While this request was partly based on the reports from the other officers about

20  the alleged assault, it was also based on what Johnson personally knew about Shriver from prior

21  interactions. The Court find Johnson's role was "integral" and summary judgment cannot be

22  granted in his favor. But there are no facts presented suggesting that Coates or Milavec were

23  involved in Shriver's arrest. At most, there is evidence that Coates wrote a report about the

24

1    arrest, but that was after the fact and not an adequate basis to impose liability. The Court

2    therefore GRANTS summary judgment in Milavec's and Coates' favor on this claim.

3             **4.      No Conspiracy Claim**

4             In their opposition, Plaintiffs argue that Defendants engaged in a conspiracy to violate

5    their civil rights. (Resp. at 15-19.) But Plaintiffs' Third Amended Complaint contains no such

6    claim and there are no facts alleged that would have put defendants on notice that Plaintiffs

7    intended to pursue such a claim. It is well established that a party cannot assert a new theory of

8    liability in response to a motion for summary judgment. See La Asociacion de Trabajadores de

9    Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1089 (9th Cir. 2010); Coleman v. Quaker

10   Oats Co., 232 F.3d 1271, 1292–93 (9th Cir. 2000). On this basis, the Court REJECTS Plaintiffs'

11   late attempt to add a conspiracy claim.

12   **E.    Qualified Immunity**

13            Defendants move for qualified immunity on all of Plaintiffs' claims. The Court finds

14   Johnson and Milavec are entitled to qualified immunity on the § 1983 claims that otherwise have

15   survived summary judgment: (1) the unlawful detention and arrest claims against Johnson; and

16   (2) the unlawful detention claims against Milavec.

17            **1.      Qualified Immunity Standard**

18            Under the doctrine of qualified immunity, "courts may not award damages against a

19   government official in his personal capacity unless the official violated a statutory or

20   constitutional right, and the right was clearly established at the time of the challenged conduct."

21   Lane v. Franks, 573 U.S. 228, 243 (2014).  The qualified immunity analysis consists of two

22   prongs: (1) whether the facts the plaintiff alleges make out a violation of a constitutional right;

23   and (2) whether that right was clearly established at the time the defendant acted. Castro v.

24

1    County of Los Angeles, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc); Orn v. City of Tacoma,

2    949 F.3d 1167 (9th Cir. 2020). A court may "exercise [its] sound discretion in deciding which of

3    the two prongs of the qualified immunity analysis should be addressed first." Pearson v.

4    Callahan, 555 U.S. 223, 236 (2009).

5            Whether a right is clearly established turns on whether it is "sufficiently definite that any

6    reasonable official in the defendant's shoes would have understood he was violating it."

7    Nicholson v. City of Los Angeles, 935 F.3d 685, 695 (9th Cir. 2019) (quoting Kisela v. Hughes,

8    138 S. Ct. 1148, 1153 (2018)).  Regarding the second prong, the Ninth Circuit has explained:

9    "We begin our inquiry into whether this constitutional violation was clearly established by

10   defining the law at issue in a concrete, particularized manner." Shafer v. County of Santa

11   Barbara, 868 F.3d 1110, 1117 (9th Cir. 2017). The Ninth Circuit also confirmed that it is the

12   plaintiff who bears the burden of showing that the rights allegedly violated were clearly

13   established. Id. at 1118. Moreover, in order to show that a right was clearly established, the

14   plaintiff must demonstrate that, at the time of the alleged violation, the state of the law gave fair

15   warning that the relevant conduct was unconstitutional. See Ballentine v. Tucker, 28 F.4th 54, 64

16   (9th Cir. 2022). "Courts should look to precedent for evidence that the unlawfulness of an

17   officer's conduct is clearly established" regardless of whether the officer is alleged to have made

18   a mistake of fact or a mistake of law. J. K. J. v. City of San Diego, 42 F.4th 990, 1001 n.4 (9th

19   Cir. 2021).

20           **2.      Johnson Entitled to Qualified Immunity**

21           The Court finds that Johnson is entitled to qualified immunity on both Fourth

22   Amendment claims asserted against him.

23

24

1    First, as to Githinji's detention, Plaintiffs have not identified any clearly established law

2    that would make Johnson liable for Githinji's initial detention.

3    Plaintiffs have pointed to clearly established law that a detention of a witness to a crime

4    "must be minimally intrusive." Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1083 (9th Cir.

5    2013) ("Although detention of witnesses for investigative purposes can be reasonable in certain

6    circumstances, such detentions must be minimally intrusive.") In Maxwell, the witnesses were

7    detained for five hours in a non-emergency situation in which the suspect was already in custody

8    and "[t]he crime was solved." See id. at 1084. The court explained further that "it is a 'settled

9    principle that while the police have the right to request citizens to answer voluntarily questions

10   concerning unsolved crimes they have no right to compel them to answer.'" Id. (quoting Davis v.

11   Mississippi, 394 U.S. 721, 727 n.6 (1969)). The Court further noted that "in the Terry stop

12   context—which involves a suspicion of criminal activity that is absent here—the Supreme Court

13   has never endorsed a detention longer than 90 minutes." Id. (citing United States v. Place, 462

14   U.S. 696, 709–10 (1983)).

15   While the clearly established law required Githinji's detention to be "minimally

16   intrusive," there is no evidence presented that Johnson caused Githinji's detention for more than

17   the purpose of backing away from the house. This appears to have been "minimally intrusive."

18   The record shows that it was Smith who kept and questioned Githinji for a lengthy period of time

19   in his patrol car. (See Dkt. No. 87-1 at 8.) Plaintiffs provide virtually no evidence as to what

20   Johnson's participation was in the detention. At most, they offer a snippet from his deposition

21   where he testified:

22       [I a]rrived on scene. I got a quick [sic], from one of the officers, what they were dealing
         with. Noticed the dog, noticed – recalled the house, then the threat of releasing the dog,
23       so I made the decision that we were backing out and getting behind cover to try to slow
         things down.

24

1   (Johnson Dep. at 52.) Johnson clarified that "backing out" was intended to "get [Githinji] away

2   from the house." (Id.) And he explained that the other officers informed him of the assault

3   "either right then or within seconds after making that decision" to back up. (Id.) His initial

4   decision to detain Githinji was therefore based on the report from the other officers and his own

5   knowledge of the dangerous dog and Shriver's weapon ownership. Plaintiffs cite to no clearly

6   established law that Johnson violated in ordering officers to secure Githinji and back her away

7   from the house. The situation presented differs greatly from Maxwell, given that Johnson

8   believed Shriver was potentially dangerous, whereas the situation in Maxwell involved a suspect

9   who was already in custody and the crime was solved. The sum total of the evidence presented

10  by Plaintiffs shows no more of Johnson's involvement in Githinji's detention. Johnson is entitled

11  to qualified immunity, and the Court GRANTS summary judgment in his favor as to this claim.

12          Second, Johnson is also entitled to qualified immunity with regard to his participation in

13  Shriver's arrest. Johnson's only apparent role in the arrest was filing the paperwork to request the

14  SWAT's assistance. While Plaintiffs point out that Johnson did not save a record of the request,

15  Plaintiffs provide no information or testimony about what Johnson put in the paperwork or how

16  Johnson violated any clearly established Fourth Amendment law by calling the SWAT team. As

17  Johnson testified, in order to call the SWAT he first had to have a warrant, which Smith obtained

18  without any apparent involvement from Johnson. The record is devoid of evidence that Johnson

19  acted on some independent knowledge that the alleged assault was fabricated. Plaintiffs provide

20  no evidence of what clearly established law Johnson's actions in this situation violated. Johnson

21  is entitled to qualified immunity and the Court GRANTS summary judgment in his favor as to

22  this claim.

23

24

### 3.     Milavec Entitled to Qualified Immunity

The Court also finds that Milavec is entitled to qualified immunity for essentially the same reasons as Johnson. Plaintiffs have only identified sufficient facts to sustain a claim that Milavec unlawfully detained Githinji. While there video evidence that Milavec physically moved Githinji away from the home, there is no evidence Milavec was involved with Githinji's longer detention. In this quasi-emergency situation Milavec's actions appear to be "minimally intrusive" and thus not in violation of clearly established law. See Maxwell, 708 F.3d at 1084. Milavec is entitled to qualified immunity and the Court GRANTS summary judgment in his favor as to this claim.

### F.     Fifth Amendment

The Court notes that although Plaintiffs have alleged a Fifth Amendment violation, they concede that the claim should really be reviewed as a Fourth Amendment challenge. For the reasons set forth above, the claim fails as to Coates, Johnson, and Milavec.

### G.     False Arrest

Lastly, the Court notes that Defendants did not move for summary judgment as to the false arrest claim. But given the factual overlap between this claim and Plaintiffs' Fourth Amendment claim, the Court finds it proper to note that there is no evidence that Coates was involved in either Githinji's detention or Shriver's arrest. The claim cannot proceed against her. But the Court otherwise passes no judgment as to whether this claim can proceed as to Johnson or Milavec, given their failure to seek summary judgment and the facts showing their participation the arrest and/or detention.

## CONCLUSION

Plaintiffs have done little to show any viable claims against OPD, Coates, Milavec, or Johnson. First, Plaintiffs concede that their claims against OPD cannot proceed. Second, Plaintiffs fail to identify any material facts supporting their negligence claim against Coates, Johnson, or Milavec. Third, Plaintiffs fail to identify any material facts supporting their Fourth Amendment false affidavit or malicious prosecution claims against Coates, Johnson, and Milavec. Fourth, Plaintiffs fail to identify any material facts supporting their Fourth Amendment unlawful seizure claims against Coates. Fifth, both Johnson and Milavec have shown that they are entitled to qualified immunity on the Fourth Amendment unlawful seizure claims asserted against them. Sixth, Plaintiffs failed to adequately plead a Fourth Amendment conspiracy claim and they have not identified any viable Fifth Amendment claim. Seventh, Plaintiffs have not identified any facts that would support a false arrest claim against Coates. For all of these reasons, the Court GRANTS summary judgment in Coates', Johnson's, and Milavec's favor on all of these claims.

The Court notes that the following claims may proceed:

1. All claims against Smith, except the Fifth Amendment claim, which Plaintiffs concede should be treated as a Fourth Amendment claim;

2. The loss of consortium claim against Coates, Johnson, and Milavec; and

3. The false arrest claim against Johnson, and Milavec.

The clerk is ordered to provide copies of this order to all counsel.

Dated February 20, 2024.

Marsha J. Pechman
United States Senior District Judge